[No. G013651. Fourth Dist., Div. Three. May 31, 1994.]

IVAR ROTH et al., Plaintiffs and Appellants, v.
FRANK A. RHODES et al., Defendants and Respondents.

## COUNSEL

James F. McGee for Plaintiffs and Appellants.

Layman, Jones & Dye, Kevin P. Bjerregaard and Robert B. Beauchamp for Defendants and Respondents.

## OPINION

RYLAARSDAM, J.*—May operators of medical buildings limit acceptable tenants to medical doctors or do statutory or common law prohibitions require them to lease space to other health care practitioners, in this instance, a podiatrist, or even the world at large? We conclude under the facts presented here, no legal requirement compels landlords to accept tenants who are not medical doctors.

Respondents Frank A. Rhodes, Gene Rhodes, Susan Rhodes, Rhodes Development Company, and Newport Center Medical Buildings (Rhodes or the Rhodes respondents) operate medical buildings in Newport Beach. According to the allegations of the complaint and as acknowledged by them, the Rhodes respondents only lease space to persons holding M.D. degrees. Appellants Ivar Roth and Ivar E. Roth, Podiatric Corporation (Roth) predicate all causes of action asserted in the complaint upon a refusal of Rhodes to rent space to Roth because of Rhodes's policy only to lease space to holders of M.D. degrees. Roth is not a medical doctor; he holds the degree of doctor of podiatric medicine. Roth appeals from a judgment entered following the granting of motions for summary adjudication and judgment on the pleadings which disposed of all causes of action asserted in the complaint.[1]

I

### FACTS AND CONTENTIONS

In his third amended complaint, Roth attacked Rhodes's policy limiting tenants to medical doctors as violations of the Cartwright Act (Bus. & Prof.

*Judge of the Orange Superior Court sitting under assignment by the Chairperson of the Judicial Council.

[1]Originally Roth also sued a number of medical doctors, tenants of Rhodes, on various conspiracy theories; he voluntarily dismissed as to them.

Code, § 16700 et seq.) and common law prohibitions on restraint of trade, unfair competition, interference with prospective business advantage, intentional interference with the right to practice a profession, and violations of the Unruh Civil Rights Act. (Civ. Code, § 51 et seq.) The trial court granted summary adjudication on all causes of action except the cause of action for interference with prospective business advantage. Roth argues his opposition to the motion presented triable issues of material fact which require resolution by a fact finder as to each of these causes of action. The trial court granted judgment on the pleadings on the cause of action for interference with prospective business advantage. Roth argues the complaint states sufficient facts to constitute a cause of action. We disagree on all counts.

At the hearing on the motions, Roth's counsel presented the court with a declaration requesting a continuance. The declaration stated Roth needed further discovery and time to obtain expert opinions. The court denied the continuance on grounds the request was untimely and the declaration was insufficient to support a continuance. Roth argues the court had a mandatory duty to continue the hearing. There was no such mandatory duty under the facts of this case, and we hold the trial court did not abuse its discretion.

Roth's factual allegations may be summarized as follows: (1) Rhodes operates medical buildings in the Fashion Island section of Newport Beach, including a building at 1401 Avocado. (2) This building, as well as the others operated by Rhodes in the area, is prestigious and offers a uniquely comprehensive range of medical services. (3) Tenancy in the Avocado building offers unique opportunities for professional referrals. (4) The Rhodes respondents conspired among themselves and with the (since dismissed) medical doctors to deny Roth's civil rights, restrain his trade, interfere with his prospective economic advantage, and prevent Roth from successfully practicing his profession by prohibiting podiatrists, including Roth, from practicing in the medical building to prevent competition with these medical doctors. (5) In furtherance of this conspiracy, Rhodes refuses to rent space to Roth in the Avocado building. (6) As a result, Roth lost potential referrals and potential direct patient contacts which would have benefited him economically.

## II

### ISSUES SUMMARIZED

The issue whether Rhodes can refuse to lease space to podiatrists is analytically no different from the question of whether the law requires a department store which caters to the high end of the market to purchase

shoes from a manufacturer who makes less expensive, lower quality shoes. Or we could ask, does the law prohibit a landlord from limiting his tenancies to lawyers, merchants, or any specific trade or profession? If managers of stores or office buildings adopt such policies, may a disappointed supplier or prospective tenant claim the right to a jury trial under the civil rights acts because such discrimination against inferior or superior merchandise or between various types of tenancies may constitute arbitrary discrimination by a business establishment? Does such discrimination constitute a violation of the antitrust laws? We answer these questions in the negative.

## III

### Do the California Civil Rights Statutes Prohibit Discrimination Between Medical Doctors and Doctors of Podiatry in the Leasing of Office Space?

■ May operators of office buildings limit their tenants to tinkers, tailors, physicians, or podiatrists? Do such restrictions violate the statutory civil rights of prospective tenants who fail to meet the landlord's occupational or professional qualifications? Do such restrictions at least raise questions of fact as to whether the exclusion constitutes arbitrary discrimination? Unless the landlord uses such restrictions as a pretext to exclude persons having the types of personal characteristics protected by the civil rights statutes (such as race, gender, or religion), they do not.

Roth claims Rhodes, who as a commercial landlord operates a business establishment, violated the Unruh Civil Rights Act (Civ. Code, § 51 et seq.). Section 51 prohibits discrimination by business establishments based on "sex, color, race, religion, ancestry, national origin, or disability." ■ A number of cases hold that the classifications of section 51 are not exclusive but illustrative only; they note the statute prohibits all arbitrary discrimination by business establishments. (See, e.g., *O'Connor v. Village Green Owners Assn.* (1983) 33 Cal.3d 790 [191 Cal.Rptr. 320, 662 P.2d 427] [age]; *Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721, 744 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161] [family status]; *In re Cox* (1970) 3 Cal.3d 205, 218 [90 Cal.Rptr. 24, 474 P.2d 992] [personal appearance]; *Pines* v. *Tomson* (1984) 160 Cal.App.3d 370 [206 Cal.Rptr. 866] [religion]; *Rolon* v. *Kulwitzky* (1984) 153 Cal.App.3d 289 [200 Cal.Rptr. 217] [homosexuality].) Section 51.5 expands on section 51 by, inter alia, specifying forms of discrimination, including refusal to deal. The rationale of *Cox* and *Marina Point* compels the conclusion that the classifications specified in section 51.5, which are identical to those of section 51, are likewise not exclusive and encompass other personal characteristics identified in earlier cases.

■ How expansive is the prohibition on arbitrary discrimination under these statutes? All economic decisions involve choices and hence require decision makers to discriminate between alternatives in making these choices. If the issue whether or not discrimination is arbitrary may require a determination in a trial before a fact finder, are all discriminators to be subjected to such a trial to defend the rational basis for their discrimination? If law firms adopt policies not to hire associates who failed to do well in law school or only those who graduated from certain highly rated law schools, may they be put in the dock for a jury to determine whether the services offered by the firm could only be performed by excellent law students? If a university insists it will only hire holders of a Ph.D. as assistant professors, would a fact finder be permitted to determine the policy represents arbitrary discrimination, and therefore violates the civil rights statutes, because many persons not holding such a degree would be able to teach as well or better?

If such policies are subterfuges for invidious discrimination, the answer is yes. A policy or a classification, in itself permissible, may nevertheless be illegal if it is merely a device employed to accomplish prohibited discrimination. For example, a case decided under title VII of the Civil Rights Act of 1964 (42 U.S.C.A. § 2000e et seq.), involving policies similar to those in the Unruh Civil Rights Act, held an employer rule prohibiting law school attendance, which was applied to female employees but not to males, violated the act. (*Chescheir* v. *Liberty Mut. Ins. Co.* (5th Cir. 1983) 713 F.2d 1142.) There is no suggestion in the case that the discrimination against law students, in and of itself, violated title VII. Similarly, *Griggs* v. *Duke Power Co.* (1971) 401 U.S. 424 [28 L.Ed.2d 158, 91 S.Ct. 849], another title VII case, held an employer could not use the requirement of a high school diploma as a pretext to exclude a racial group, where the possession of such a diploma was unrelated to the skills required for the performance of the work.

Roth makes no allegation that Rhodes's policy had any such ulterior purpose. He does not suggest the true reason for his exclusion was his membership in any of the classes enumerated in the statute or within the penumbra of categories identified in case law as being protected by the civil rights laws. There is no hint that the policy adopted by Rhodes was applied in light of the prospective tenant's race, sex, religion, or any other personal characteristic. Indeed, we have nothing in the record to suggest that Roth was a member of any minority group other than podiatrists.

Cases noted above, expanding application of the Unruh Civil Rights Act to categories of persons other than those specified in the statute, have used the general statement, ". . . the Legislature intended to prohibit all arbitrary

discrimination by business establishments." (*In re Cox, supra,* 3 Cal.3d 205, 216.) In spite of this broad language, all these cases involve "discrimination based on personal characteristics similar to the statutory classifications of race, sex, religion, etc. . . ." (*Harris* v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1156 [278 Cal.Rptr. 614, 805 P.2d 873].) The court in *Harris* dealt with economic discrimination; it held the Unruh Civil Rights Act did not prohibit a landlord from rejecting tenants who failed to meet a minimum income standard. (*Id.* at pp. 1143, 1163-1164.) In reviewing the legislative history of California's civil rights statutes, the court concluded, "In order to give significance to the Legislature's specific and repeated emphasis on these categories [i.e. race, color, religion, etc.], we must ascertain their common element. The categories involve personal as opposed to economic characteristics—a person's geographical origin, physical attributes, and personal beliefs." (*Id.* at p. 1160.)

Furthermore, apparently referring to classifications other than those statutorily protected, Harris notes, ". . . the California appellate cases have also recognized that legitimate business interests may justify limitations on consumer access to public accommodations." (*Harris* v. *Capital Growth Investors XIV, supra,* 52 Cal.3d at p. 1162.) Such a legitimate business interest is obvious here. Operators of commercial buildings have legitimate reasons to designate the purposes for which they wish to let them by limiting their tenants to certain trades or professions or with respect to the type of merchandise sold. If a shopping mall is intended to appeal to a particular segment of the market, it serves no social or economic purpose for the law to demand that tenants not in keeping with this objective be granted leases. If operators of an office building perceive a niche in the market for a particular type of tenant, no useful purpose is to be served by our interfering with their economic decision to so limit the tenancy. It may well be that the very prestige which Roth attributes to Rhodes's medical building, and on which Roth desires to trade, is in part the result of Rhodes's leasing policies. Unless legally prohibited discrimination results, a court should not insinuate itself into the market place to prohibit Rhodes from maintaining such policies as have resulted in the commercial success attributed to him by Roth.

The election to practice a particular profession represents a professional and, frequently, an economic choice, rather than a personal characteristic of the type enumerated in the act. We therefore conclude discrimination in leasing office space based on profession, as long as it is not a strategem designed to disguise discrimination based on personal characteristics protected under the Unruh Civil Rights Act, is not prohibited under the act. Hence, the trial court properly concluded Roth could not recover on the basis of the asserted cause of action for violation of his statutory civil rights.

## IV

### DOES THE CARTWRIGHT ACT PROHIBIT THE LANDLORD OF A MEDICAL BUILDING FROM REFUSING TO LEASE TO ANYONE BUT MEDICAL DOCTORS?

Roth bases four causes of action in his third amended complaint on restraint of trade: (1) restraint of trade under the Cartwright Act (Bus. & Prof. Code, 16700 et seq.); (2) common law restraint of trade; (3) damages for unfair competition; and (4) injunction for unfair competition. Roth stipulated at the hearing below and acknowledges in his brief the second, third, and fourth of these depend upon the viability of the Cartwright Act cause of action. Since we conclude the court properly granted the motion for summary adjudication of issues on the Cartwright Act cause of action, further discussion of the other three causes of action is unnecessary.

Does any principle of antitrust law give Roth the right to rent from Rhodes? Roth alleges, and we will accept as a fact, podiatrists compete with medical doctors with respect to certain procedures. ■ The Cartwright Act, which prohibits restraint of trade, applies to professions. (*Cianci v. Superior Court* (1985) 40 Cal.3d 903, 916 [221 Cal.Rptr. 575, 710 P.2d 375].) Roth argues that Rhodes's refusal to lease constitutes a vertical restraint of trade (apparently relying on Business and Professions Code section 16727) and that the Rhodes respondents conspired among themselves and with some of the tenants (the dismissed medical doctors) to restrain his trade (relying on Business and Professions Code sections 16720 and 16726). Although he commingles arguments relating to vertical restraint and conspiracy to restrain trade, the two theories represent distinct violations of antitrust laws. However, under either theory, if the conduct charged against Rhodes constitutes an illegal restraint of trade, we should reverse the decision of the trial court granting summary adjudication in favor of Rhodes on the restraint of trade causes of action.

Roth does not contend Rhodes prevented him from practicing his profession. He does not contend Rhodes's building was the only place where he could treat his patients. He does not contend he is limited in his ability to practice his profession or patients will not come to his office because of its undesirable location or inadequate facilities. Roth's only contention is that Rhodes's building is more prestigious than others and, were he granted a tenancy, he would reap greater economic reward than in the accommodations available to him.

*Do the facts asserted by Roth support a potential finding of a "vertical restraint of trade" in an attempt to monopolize?*

■ Roth characterizes his claim as a "vertical restraint of trade." Although no statutory referrence is provided, this claim appears to be made under Business and Professions Code section 16727 which prohibits a lease[2] from containing a condition the lessee shall not deal with a competitor "where the effect of such lease . . . or such condition . . . may be to substantially lessen competition or tend to create a monopoly . . . ."

First, this claim is not encompassed within the causes of action pleaded; Roth bases these on a conspiracy to restrain trade, rather than on an attempt to monopolize by refusing to deal. As noted, these are independent bases for recovery. A party cannot successfully resist summary judgment on a theory not pleaded. (*580 Folsom Associates* v. *Prometheus Development Co.* (1990) 223 Cal.App.3d 1, 18 [272 Cal.Rptr. 227].)

In any event, we question whether a vertical restraint analysis is appropriate under the facts presented. All cases cited by Roth in support of his analysis and all cases disclosed through our research dealing with vertical restraints, involve claims against suppliers in the same stream of commerce as the person or entity claiming the restraint. Business and Professions Code section 16727 expressly refers to "competitors."

Reviewing the cases cited by Roth: *G.H.I.I.* v. *MTS, Inc.* (1983) 147 Cal.App.3d 256 [195 Cal.Rptr. 211] deals with the relationship between, on the one hand, retail record stores and, on the other, producers and distributors of records and tapes; *Bert G. Gianelli Distributing Co.* v. *Beck & Co.* (1985) 172 Cal.App.3d 1020 [219 Cal.Rptr. 203] deals with the relationship between a brewer and, independent local beer distributors; *Columbia Broadcasting Sys.* v. *Am. Soc. of Composers* (2d Cir. 1980) 620 F.2d 930 deals with television networks and the holders of copyrights to music performed on the networks; and *Redwood Theatres, Inc.* v. *Festival Enterprises, Inc.* (1988) 200 Cal.App.3d 687 [248 Cal.Rptr. 189] deals with film distributors and theater chains. The one case cited by Roth for the proposition the parties need not be in the same product line, *Lowell* v. *Mother's Cake & Cookie Co.* (1978) 79 Cal.App.3d 13 [144 Cal.Rptr. 664], did not concern the issue of vertical restraints at all and held, albeit on unrelated grounds, the Cartwright Act did not apply. Here the services offered by Rhodes (commercial leasing)

---

[2]On its face, the statute appears to be limited to chattel leases; no similar California statute relating to leases of real property exists. However, we do not suggest that, on appropriate facts, restrictions in real property leases may not violate antitrust laws. (See, e.g., *People* v. *Mobile Magic Sales, Inc.* (1979) 96 Cal.App.3d 1 [157 Cal.Rptr. 749].)

do not place him in the same stream of commerce as the services offered by Roth (podiatry). On this ground alone, a "vertical restraint of trade" analysis appears to be inappropriate.

However, even if concepts of vertical restraint of trade were to be applied, we nevertheless conclude no triable issues of fact exist on this theory. ■ The complaint is framed under California's Cartwright Act; however "[a] long line of California cases has concluded that the Cartwright Act is patterned after the Sherman Act and both statutes have their roots in the common law. Consequently, federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act." (*Marin County Bd. of Realtors, Inc.* v. *Palsson* (1976) 16 Cal.3d 920, 925 [130 Cal.Rptr. 1, 549 P.2d 833]; *Redwood Theatres, Inc.* v. *Festival Enterprises, Inc., supra,* 200 Cal.App.3d at p. 694.) *Redwood Theatres,* in accordance with this principle, reviews a number of federal cases applying the federal antitrust laws to marketing practices in the motion picture industry. Although the court notes, "[t]he unusual competitive conditions of the theatre business, marked by the presence of a unique product in short supply, put an entirely different complexion on the issue of market power" (*id.* at p. 707), the case nevertheless provides us with certain basic principles which aid in our analysis here.

*Redwood Theatres* characterizes the refusal of a supplier to deal with a potential customer as a "vertical restraint" and holds, "[u]nder *Continental T.V., Inc.* v. *GTE Sylvania Inc.* [(1977)] 433 U.S. 36 [53 L.Ed.2d 568, 97 S.Ct. 2549], such vertical restraints are subject to a rule-of-reason analysis to determine their impact on competition." ( *Redwood Theatres, Inc.* v. *Festival Enterprises, Inc., supra,* 200 Cal.App.3d at p. 703, fn. omitted.) "Since the *Sylvania* decision, several other federal courts applying the rule of reason to vertical restraints have required [a] threshold inquiry into the defendant's market power. [Citations.] As a practical matter, market power is usually equated with market share. 'Since market power can rarely be measured directly by the methods of litigation, it is normally inferred from possession of a substantial percentage of the sales in a market carefully defined in terms of both product and geography.' [Citations.]" (*Id.* at p. 704.) "To meet his initial burden in establishing that the practice is an unreasonable restraint of trade, plaintiff must show that the activity is the type that restrains trade and that the restraint is likely to be of significant magnitude. [Citation.] Ordinarily, a plaintiff to do this must delineate a relevant market and show that the defendant plays enough of a role in that market to impair competition significantly." (*Bhan* v. *NME Hospitals, Inc.* (9th Cir. 1991) 929 F.2d 1404, 1413.)

■ Rhodes supported his motion with the declaration of a qualified economist. This declaration demonstrated neither the building in which Roth

sought a tenancy, nor the other buildings operated by Rhodes, constituted separate relevant geographic markets. Roth's admission that the area from which he draws his patients includes southern Orange County and Newport Beach, Irvine, Costa Mesa, and Huntington Beach also supports his conclusion. According to the economist, that market consists at least of the Newport Beach, Irvine, Costa Mesa, and Huntington Beach area. Within this area alone, there are some 59 medical buildings, 5 of which Rhodes operates. None of this was contradicted by Roth.

Applying the market share test to the facts, we find, on the basis of the number of buildings in the relevant market area, Rhodes controls less than 10 percent of the market. Were we to include all of southern Orange County, which is included in the area from which Roth acknowledges drawing his patients, the percentage would be even lower. Although we were not presented with square footage, which might give us a more refined measure of market share, as noted in *Redwood Theatres*, a market share of 16 percent fails "conspicuously to pass the threshold test establishing the defendant's market power." (200 Cal.App.3d at p. 704.) It is obvious there is no violation of the antitrust statutes, under the market share test, the basis for the rule of reason. Therefore, even if a vertical restraint analysis was appropriate, we must conclude summary adjudication in favor of Rhodes was proper, unless there is a triable issue of fact as to whether Rhodes engaged in a conspiracy to restrain trade.

*Is there a triable issue of fact whether Rhodes engaged in a conspiracy to restrain trade?*

██ The Cartwright Act, like the Sherman Act, prohibits "combinations" for the purpose of restraining trade. "[A] combination means a concert of action by individuals or entities maintaining separate and independent interests." (*Bondi* v. *Jewels by Edwar, Ltd.* (1968) 267 Cal.App.2d 672, 678 [73 Cal.Rptr. 494]. See also *State of California* ex rel. *Van de Kamp* v. *Texaco, Inc.* (1988) 46 Cal.3d 1147 [252 Cal.Rptr. 221, 762 P.2d 385].) ██ Early in the history of federal antitrust law, the United States Supreme Court recognized in *United States* v. *Colgate & Co.* (1919) 250 U.S. 300, 307 [63 L.Ed. 992, 997, 39 S.Ct. 465, 7 A.L.R.443], "[i]n the absence of any purpose to create or maintain a monopoly, . . . [traders] engaged in an entirely private business [have the right to] freely . . . exercise [their] own independent discretion as to the parties with whom [they] will deal . . . ." Absent such a monopolistic purpose, and unless prohibited by other statutes, such as the civil rights statutes, discussed above, landlords may freely rent to whomever they please and likewise not rent to whomever they please.

However, a concerted refusal to deal may run afoul of the antitrust statutes. Business and Professions Code section 16726 declares, with exceptions not relevant here, "trusts" are "unlawful, against public policy and

void." Business and Professions Code section 16720 defines a "trust" as "a combination of capital, skill or acts by two or more persons" for certain defined purposes. The statute defines combinations "[t]o create or carry out restrictions in trade or commerce" among these illegal purposes. Therefore, if there is a triable issue of fact as to whether Rhodes may have acted in concert with others for the purpose of depriving Roth of the desired tenancy, the court should not have granted the motion for summary adjudication. We next examine whether a triable issue exists.

Roth argues the Rhodes respondents "agreed amongst each other and with the dismissed doctors to restrict the competition of Podiatrists, and in particular Dr. Roth, with medical doctors located in the Buildings." The alleged agreement or combination among the Rhodes respondents, the owners and operators of the building, cannot support the claim under the Cartwright Act. The Rhodes respondents jointly engage in the single enterprise of managing the medical building; as such each is the agent for the others. "[A]n individual acting alone through his agent or a corporation acting alone through its officers is not a combination in restraint of trade proscribed by the statute." (*Bondi* v. *Jewels by Edwar, Ltd., supra,* 267 Cal.App.2d at p. 678.)

Therefore, we need to determine whether facts exist from which a fact finder could conclude the Rhodes respondents conspired with others to restrain Roth's trade. The complaint alleges: "From the opening of the MEDICAL BUILDING and up until the present time, the Defendants, and each of them, have combined, conspired, and agreed together and continue to combine, conspire, and agree to restrain trade by prohibiting Podiatrists, and Plaintiffs in particular, from opening a practice in the medical buildings. . . ." Other than Rhodes, Roth only mentions as defendants certain medical doctors, tenants in the building. Although these defendants were originally served, Roth voluntarily dismissed them some time prior to the hearing on the motions. Their absence from the case, in and of itself, is not fatal to Roth's claim. The law does not require a plaintiff to join all coconspirators in the action. "[A]ntitrust coconspirators are jointly and severally liable for all damages caused by the conspiracy" (*William Inglis, Etc.* v. *ITT Continental Baking Co.* (9th Cir. 1981) 668 F.2d 1014, 1052-1053); thus a plaintiff may choose to sue any or all of them. (*Walker Distributing Co.* v. *Lucky Lager Brewing Co.* (9th Cir. 1963) 323 F.2d 1, 8.)

In support of their motion, the Rhodes respondents relied on declarations by three of their principals and deposition testimony of Roth. The declarations show the "M.D. only" policy was adopted unilaterally and had been in effect since the development of the buildings in 1967. The declarations also

demonstrate the economic justification for the policy: quality control and enhancing the reputation of the building in the eyes of the medical profession and the general public. The declarations explicitly deny Rhodes ever entered into any agreements with anyone to deprive Roth of space in the building. In his deposition Roth testified he had no knowledge of any agreement between Rhodes and the medical doctors.

In opposition to the motion, Roth submitted only his own declaration. The only "evidence" submitted by Roth to contradict Rhodes's denial of the existence of an agreement or conspiracy, was his statement: "By the systematic way in which I was continually rejected as a tenant to the Defendants' buildings and given the sometimes contradictory statements on each occasion given by the Defendants in refusing me as a tenant, it appears that there exists an understanding, agreement, and combination of each of the Defendants to refuse me as a tenant." Since Roth had already dismissed the medical doctors when his declaration was filed, this statement appears to refer only to an agreement among the Rhodes respondents. Even if the statement is read to include the medical doctors, it amounts to mere speculation and Rhodes properly objected on this ground. ■ Furthermore, admissions made in the course of a party's deposition cannot be contradicted solely by that party's declaration in opposition to summary judgment. (*Thompson* v. *Williams* (1989) 211 Cal.App.3d 566, 573 [259 Cal.Rptr. 518].) The trial court presumably disregarded this portion of Roth's declaration or should have done so.

■ The evidence offered by the Rhodes respondents concerning the absence of any agreement or conspiracy was uncontradicted. Absent such contradictory evidence, the trial court correctly concluded there was no triable issue of fact with respect to any agreement or conspiracy. In the absence of proof of an agreement or conspiracy, there cannot be a violation of Business and Professions Code sections 16720 and 16726. The court properly granted the motion for summary adjudication on the causes of action based on the Cartwright Act.

V

DOES THE COMPLAINT STATE FACTS SUFFICIENT TO
CONSTITUTE A CAUSE OF ACTION FOR INTERFERENCE WITH
PROSPECTIVE ECONOMIC ADVANTAGE?

■ The trial court granted judgment on the pleadings on Roth's cause of action for interference with prospective economic advantage. A motion for judgment on the pleadings performs the same function as a general

demurrer and " ' "admits all material and issuable facts pleaded." ' " (*Bail-largeon* v. *Department of Water & Power* (1977) 69 Cal.App.3d 670, 676 [138 Cal.Rptr. 338].) The essence of this cause of action is the allegation "the Orthopod Defendants induced the RHODES DEFENDANTS not to lease space in the Medical Building to plaintiffs so that plaintiffs would not compete with the Orthopod Defendants for patients." At the time of the motion the Rhodes defendants were the only defendants remaining in the case. The allegation only charges the dismissed medical doctors. Since the complaint does not allege Rhodes interfered with the relationship between Roth and future patients, it was appropriate for the trial court to determine no cause of action was stated against Rhodes.

In addition, an essential element of the tort of intentional interference with prospective business advantage is the existence of a business relationship with which the tortfeasor interfered. (*Asia Investment Co.* v. *Borowski* (1982) 133 Cal.App.3d 832, 840-841 [184 Cal.Rptr. 317, 30 A.L.R.4th 561].) Although this need not be a contractual relationship, an existing relationship is required. (*Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815, 829 [122 Cal.Rptr. 745, 537 P.2d 865].) None is alleged. Roth's case is predicated on the claim a tenancy in Rhodes' building would result in future referrals and patient contacts. Therefore, from the very nature of this claim it follows Roth cannot have an existing relationship with these speculative "future patients."

The trial court correctly concluded "[t]he pleadings do not allege any other specific economic relationship with which Rhodes interfered." The motion for judgment on the pleadings was properly granted.

VI

DO THE FACTS SUPPORT A POTENTIAL RIGHT OF ROTH TO RECOVER FOR INTERFERENCE WITH HIS RIGHT TO PRACTICE HIS PROFESSION?

Citing *Lewin* v. *St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368 [146 Cal.Rptr. 892], Roth acknowledges that, before there may be liability for intentional interference with the right to pursue a lawful calling, such interference must be either by unlawful means or by means which are otherwise lawful but without sufficient justification or privilege. (*Id.* at p. 392; *Blank* v. *Palo Alto-Stanford Hospital Center* (1965) 234 Cal.App.2d 377, 384 [44 Cal.Rptr. 572].) For all of the reasons discussed in the preceding parts of this opinion, we conclude Rhodes did not act unlawfully. Nor was there a triable issue of fact regarding justification; Rhodes's legitimate business purposes (quality control and increased reputation for the facility) were uncontradicted. Finally, there was no basis for claiming an

interference at all in light of the absence of any contention by Roth that he was prevented from practicing his profession or was unable to obtain adequate facilities to treat his patients as a result of Rhodes's conduct. The motion for summary adjudication on this cause of action was properly granted.

## VII

### DID THE TRIAL COURT ABUSE ITS DISCRETION IN REFUSING TO GRANT A CONTINUANCE OF THE HEARING ON THE MOTIONS?

At the time of the hearing on the motions, Roth presented the court with a declaration requesting a continuance. Roth claimed he needed time to conduct further discovery and interview his expert witnesses. The court denied the request, finding the declaration was untimely and insufficient to support a continuance. We conclude the court did not abuse its discretion in refusing to accede to the late request for continuance.

Code of Civil Procedure section 437c, subdivision (h), provides, "If it appears from the affidavits submitted in opposition to a motion for summary judgment or summary adjudication or both that facts essential to justify opposition may exist but cannot, for reasons stated, then be presented, the court shall deny the motion, or order a continuance to permit affidavits to be obtained or discovery to be had or may make any other order as may be just." Roth claims this imposed a mandatory duty on the court to grant the continuance. We disagree for a number of reasons.

We first note the court did not hear the motion until six weeks after it had been filed. Next, the court had already once continued the hearing at Roth's request to permit him to file late opposition. The statute does not provide for an unlimited number of continuances. At the time of the motion, the case had been pending two and one-half years, well beyond the goals of the Trial Court Delay Reduction Act of 1990. (Gov. Code, § 68600 et seq.) The case was close to trial. Although the trial was subsequently continued, at the time the motion was noticed, it was scheduled to be heard near the last day permitted by Code of Civil Procedure section 437(c), subdivision (a), which requires the motion to be heard no later than 30 days before the date of trial. Roth did not request the continuance until the time of the hearing. This, in and of itself, is an adequate basis for denial of the continuance. Being mindful of the preparation time required of the trial judge for a motion of this type, we recognize where such a request is made after the court reviewed the matter in preparation for the hearing, substantial inefficiencies

result if continuance is granted. No reason was given for the lateness of the request.[3] This too, was a sufficient basis for the denial of the continuance.

Finally, the declaration failed to satisfy the requirements of Code of Civil Procedure section 437c, subdivision (h). It is not sufficient under the statute merely to indicate further discovery or investigation is contemplated. The statute makes it a condition that the party moving for a continuance show "facts essential to justify opposition may exist." The declaration indicates two depositions remained to be completed and Roth had not yet received his expert opinions. However, there is no statement which suggests what facts might exist to support the opposition to the motions. The trial court was fully justified in finding the declaration insufficient to support a continuance.

The judgment is affirmed.

Sills, P. J., and Crosby, J., concurred.

---

[3]In passing, we note the lack of courtesy to court and opposing counsel implied in such a last minute request for continuance, absent any excuse being tendered for the lateness of the request.