In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-3176

LARRY HARMON, et al.,

*Plaintiffs-Appellants,*

*v.*

BEN GORDON,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 CV 01823—**Charles P. Kocoras,** *Judge.*

ARGUED FEBRUARY 15, 2013—DECIDED MARCH 21, 2013

Before FLAUM, WOOD, and HAMILTON, *Circuit Judges*.

FLAUM, *Circuit Judge*. In 2004, Larry Harmon entered into an agreement on behalf of Larry Harmon & Associates, P.A. ("LHA"), to provide Chicago Bulls rookie Ben Gordon with financial and consulting services. Although the contract stated that Harmon would serve as Gordon's financial and tax advisor for the "duration of [his] playing career," it outlined a compensation arrangement only for the length of Gordon's rookie contract with the Bulls. In 2007, Gordon became unsatisfied with Harmon's services, based in part on

what he viewed to be a breach of a fiduciary duty relating to a bad investment, and prematurely terminated the parties' financial and consulting services agreement. Litigation ensued. Gordon first sued Harmon, claiming Harmon had breached a promissory note between the parties and had breached his fiduciary duties. In the course of that lawsuit, Harmon asserted counterclaims against Gordon for breach of the financial services and consulting agreement and tortious interference with prospective business advantage. The district court dismissed Harmon's tortious interference claim under Rule 12(b)(6) and dismissed his breach of contract claim under Rule 12(b)(1). Harmon then refiled his breach of contract claim in Illinois state court and also alleged malicious prosecution, abuse of process, and tortious interference with prospective business advantage claims. After Gordon removed the case to federal court, the district court dismissed each of Harmon's tort claims and granted summary judgment in Gordon's favor on Harmon's breach of contract claim, concluding that the parties had intended their agreement to last only for the length of Gordon's rookie contract. Harmon timely appealed the district court's summary judgment ruling and its dismissal of his malicious prosecution and tortious interference claims. For the reasons set forth below, we affirm.

## I.  Background

### A.  Factual Background

In 2004, Gordon signed a three-year rookie contract with the Chicago Bulls, which included an option for the

Bulls to extend his contract for a fourth year. On May 17, 2004, Gordon entered into a financial services and consulting agreement with Harmon[1] (the "Agreement"), which stated that Harmon would provide his services to Gordon for the "duration of [Gordon's] playing career." Despite this language, the parties agreed to a compensation arrangement that would last only through the end of Gordon's rookie contract. The Agreement provided that in exchange for Harmon's services, Gordon would pay Harmon $4,000 per month during his first season, $5,000 per month during his second season, and $6,000 per month during his third and (potential) fourth seasons. The Agreement also stated that at the end of Gordon's rookie contract, Harmon would "evaluate the amount of work" performed on Gordon's behalf and provide Gordon "with a new engagement letter at that time."

On May 5, 2006, Harmon emailed Gordon and informed him that the Agreement's monthly payments would be replaced by a percentage-based fee equal to 1.5% of Gordon's annual income beginning with Gordon's April 2006 invoice. Gordon paid monthly invoices pursuant to the modified fee schedule from April 2006 to June 2007. In August 2006, however, Gordon expressed his concern to Harmon about the fee change during an

---

[1] "Harmon" refers to Larry Harmon and LHA collectively as appellants. LHA, a California partnership that provides accounting and financial services to its clients, is now known as Harmon-Castillo, LLP. Larry Harmon is a California resident and LHA's President and CEO.

email discussion, and the debate over the fee change continued into the fall of 2006 and the winter of 2006-07. The exchange concluded with an April 10, 2007 email sent to Gordon, in which Harmon stated, "[y]ou and I have had many discussions about fees in your second contract and have agreed to come up with a working resolution when that time comes, based on the prior history of your account, which I think is more than fair, for the both of us."

During the course of the parties' dealings in 2006, Harmon brought a California real estate project to Gordon's attention. Gordon alleged that Harmon had described the project as an investment opportunity in a commercial real estate development and that he believed he would obtain an ownership interest in the project if he invested. Harmon asserted, however, that Gordon was never promised ownership in the property. In February 2007, Gordon transferred $1,000,000 to Vitalis Partners ("Vitalis"), an entity affiliated with Harmon, and the parties executed a promissory note. The transaction was structured in the form of a loan to Vitalis without an ownership interest attached, and the promissory note provided that Vitalis would pay Gordon monthly interest payments on the loan. Vitalis failed to make such payments in March through June of 2007.

Dissatisfied with Harmon's performance, Gordon terminated Harmon's services and discontinued his monthly payments on July 1, 2007. His rookie contract with the Chicago Bulls continued into 2008.

## B. Procedural Background

Gordon filed suit against Harmon, Vitalis, and one other individual in September 2007 (the "*Gordon* lawsuit"), alleging that Vitalis breached the parties' promissory note by failing to make interest payments and that Harmon breached his fiduciary duty to Gordon in connection with the fee change and the real estate project. In his answer, Harmon asserted counterclaims against Gordon for breach of the Agreement and tortious interference with prospective business advantage. The district court dismissed the tortious interference counterclaim for failure to state a claim under California law, but denied Gordon's motion to dismiss with respect to the other counterclaim. Gordon then moved for summary judgment on his breach of contract claim, and Harmon moved for summary judgment on Gordon's breach of fiduciary duty claim. After determining that Harmon had breached the promissory note, the district court entered judgment in Gordon's favor in the amount of $1,386,666.67. Finally, the district court granted summary judgment for Harmon on Gordon's breach of fiduciary duty claim and dismissed for lack of jurisdiction Harmon's breach of contract claim relating to Gordon's repudiation of the Agreement because Harmon did not plead an amount in controversy.

On March 2, 2010, Harmon re-filed his breach of contract and tortious interference claims in the Circuit Court of Cook County under Illinois law (the "*Harmon* lawsuit"). Gordon removed the case to the district court on March 23, 2010. Harmon then filed an amended com-

plaint adding claims against Gordon for malicious prosecution and abuse of process. The district court dismissed Harmon's tort claims on January 27, 2011. With respect to Harmon's tortious interference claim, the district court held that the claim was barred by the prior dismissal of the same claim in the *Gordon* lawsuit. Because Harmon based the tortious interference claim in the *Gordon* lawsuit on California law and his re-filing of the claim on Illinois law, the district court also held that Harmon was judicially estopped from "adopt[ing] two different postures in two cases arising out of the same facts." As to the malicious prosecution claim, the district court held that Harmon did not plead special damages as required under Illinois law.

The parties subsequently filed cross motions for summary judgment on Harmon's breach of contract claim based on Gordon's termination of the Agreement. Harmon argued that the Agreement served as an enforceable contract for the duration of Gordon's playing career, whereas Gordon argued that the parties had agreed on a valid contract only for the length of his contract with the Bulls.

In reaching its decision on the breach of contract claim, the district court considered testimony Harmon had given during a deposition in the *Gordon* lawsuit relating to the Agreement's duration. In relevant part, Harmon testified:

> Q.  How were you going to determine—at that point in time as of May 2004, how were you going to determine what Mr. Gordon would pay you after the fourth year?

A.  After sitting down and talking about it.

Q.  Would there be a new contract executed at that time?

A.  That's correct.

Q.  Okay. So it was contemplated at the time of this contract that in four years—in three or four years, depending on whether his option was exercised, whether you and Mr. Gordon would execute another contract?

A.  Correct.

[. . .]

Q.  Do you have any idea what that new contract would have said?

A.  What that new contract would have said?

Q.  Yeah.

A.  At that particular time?

Q.  Yeah.

A.  No.

Q.  Do you have any idea what the fee agreement would have been at that particular time?

A.  It says right here "amount of work we performed on your account"—"provide you with a new letter."

Q.  That would be a negotiation between you and Mr. Gordon at that time, right?

A. Correct.

Q. It was contemplated at the time of May of 2004 that this contract would be in force or effect for three or four years, and then you'd execute another contract with Mr. Gordon?

A. That's correct.

Q. As you sit here today, there's no way you could have predicted what that contract would have said?

A. Correct.

Q. In fact, there is no way you could have predicted if Mr. Gordon would have even signed another contract; is that correct?

A. Never prediction of that.

Q. Okay. So it would be all speculation to say that Mr. Gordon, after three or four years, would have signed another contract with you?

A. You would think that most of the work you do, most of your clients are lifetime contracts, but you don't know.

Q. Did Mr. Gordon ever sign another written contract with you after this?

A. Not a signed, but—the answer is no.

In opposition to Gordon's motion for summary judgment, Harmon submitted a supplemental affidavit addressing the terms of the Agreement. In the affidavit, Harmon stated that he agreed to provide services

to Gordon for the entirety of his playing career and at no time did Harmon or LHA consent to limiting the Agreement's duration. The district court rejected Harmon's affidavit, reasoning that "[a] party cannot submit an affidavit whose statements contradict prior deposition or sworn testimony."

In light of Harmon's deposition testimony, the district court concluded that there was no material issue of fact that the parties had intended their contract to last only for Gordon's three or four seasons with the Bulls. Accordingly, the district court entered summary judgment in Gordon's favor. In addressing damages, the district court explained that Harmon's calculation of lost fees was based on a contract lasting for the duration of Gordon's NBA career, and it therefore denied Harmon's motion for summary judgment in its entirety.

## II. Discussion

On appeal, Harmon argues that the district court erred in concluding that the parties intended the Agreement would last only for the length of Gordon's rookie contract with the Bulls. Harmon asserts that under the terms of the Agreement, he is entitled to 1.5% of Gordon's salary for the remainder of Gordon's career in the NBA. If, however, the district court correctly interpreted the terms of the Agreement, it is Harmon's position that he is entitled to damages for Gordon's unpaid fees during the remainder of Gordon's rookie contract. Finally, Harmon argues that the district court erred in dismissing his tortious interference and malicious prosecution

claims. Upon review, we find Harmon's arguments unconvincing and affirm the district court's rulings in this case.

## A. Breach of Contract Claim

Harmon's first set of arguments pertain to the district court's grant of summary judgment in Gordon's favor on Harmon's breach of contract claim. Harmon contends that the district court improperly considered extrinsic evidence and misconstrued Harmon's deposition testimony when interpreting the terms of the Agreement. He further argues that even if the district court's interpretation of the contract was correct, he was nonetheless entitled to damages for Gordon's unpaid fees between July 2007 and June 2008. We review the district court's grant of summary judgment de novo and draw all reasonable inferences from the evidence in the light most favorable to the nonmoving party. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 606 (7th Cir. 2006).

### 1. There is no material issue of fact that the parties entered into only one contract intended to last for the duration of Gordon's rookie contract.

In construing a contract, a court's primary objective is to ascertain and give effect to the intention of the parties. *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011). The contract must be construed as a whole; each provision must be viewed in light of the other provisions in the contract. *Id.* If the contract's language is unambiguous,

it must be given its plain and ordinary meaning. *Id.* If, however, the contract is "susceptible to more than one meaning," the court may consider extrinsic evidence to determine the parties' intent. *Id.*

Under Illinois law, when a court decides that a contract is ambiguous, its interpretation generally becomes a question of fact for the jury. *Cont'l Cas. Co. v. Nw. Nat'l. Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). If, however, "the extrinsic evidence bearing on the interpretation is undisputed," the construction of the ambiguous contract is a question of law for the court. *Id.* (quoting *Baker v. America's Mortg. Servicing, Inc.*, 58 F.3d 321, 326 (7th Cir. 1995)). Summary judgment is appropriate when no reasonable jury could find for the plaintiff even when all reasonable inferences are drawn from the undisputed extrinsic evidence. *Id.*

Harmon contends that the parties' intent is clear from the language of the Agreement and that the district court should not have considered extrinsic evidence to determine the Agreement's duration. Harmon points to the language in the Agreement stating that LHA "will provide detailed financial and tax consulting services for the duration of [Gordon's] playing career in the National Basketball Association ("NBA")" in arguing for the Agreement's lack of ambiguity. Despite this language, however, the Agreement outlined a payment structure only for the duration of Gordon's three- or four-year rookie contract. Moreover, the Agreement specified that "[a]fter [Gordon's] rookie contract, [LHA] will evaluate the amount of work that [it has] performed on

[his] account and provide [him] with a new engagement letter at that time."

Because the Agreement lacks any provisions for compensation beyond Gordon's rookie contract, it does not unambiguously bind the parties for longer than the three or four years of that contract. We need not determine whether the Agreement could ever be interpreted to impose that obligation on Gordon. From Harmon's perspective, the best that can be said of the Agreement is that it is ambiguous as to lasting beyond Gordon's rookie contract. But even if we assume the Agreement's language is ambiguous, we agree with the district court that the extrinsic evidence removes any ambiguity as a matter of law.

Harmon argues that if the parties' intent is not clear from the Agreement's language, the question of contractual ambiguity is a question for the jury and not for the judge and the district court should not have reached this issue at the summary judgment stage. Under Illinois law, however, "whether a contract is ambiguous is a question of law for the court." *Shields Pork Plus, Inc. v. Swiss Valley Ag Serv.*, 767 N.E.2d 945, 949 (Ill. App. Ct. 2002). It is true that once contractual ambiguity is established, the task of interpreting the contract's meaning generally becomes a question of fact for the jury. *Cont'l Cas.*, 427 F.3d at 1041. In this case, however, the district court seemingly concluded that the extrinsic evidence at issue was undisputed and that the construction of the ambiguous contract was therefore a question of law for the court. We agree.

   The extrinsic evidence relevant to the interpretation of the contract is Harmon's sworn deposition testimony from the *Gordon* lawsuit, which relates directly to the Agreement's duration. During his deposition, Harmon testified that the parties intended to execute a new agreement after Gordon's rookie contract. He indicated that at the time the parties executed the Agreement, he could not predict what a new contract would have said or even that Gordon would have entered into a second contract. Instead, he explained that the parties intended to engage in a negotiation about the terms of a second contract at the appropriate time.

   In an apparent attempt to dispute this relevant extrinsic evidence, Harmon submitted a supplemental affidavit with his motion for summary judgment in the district court. In the affidavit, Harmon stated, "I have reviewed Gordon's assertion that the Agreement would only be in force for the first four years of Gordon's NBA career. This is incorrect. The Agreement specifically provided that LHA was to be Gordon's financial and tax adviser for the entire duration of Gordon's NBA playing career." Dkt. 69 at 2. However, Harmon's representation directly contradicts his earlier deposition testimony, which clearly indicated the parties' intent to negotiate a new contract following Gordon's three or four seasons with the Bulls, and "the law of this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony." *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996). Thus, assuming the Agreement's ambiguity, the dis-

trict court appropriately considered the sworn deposition testimony in ascertaining the parties' intent.

Read together, Harmon's testimony and the language of the Agreement make clear that the parties intended the Agreement to last only for the length of Gordon's rookie contract. The Agreement outlined the terms of the parties' relationship for only three or four years and indicated that Harmon would provide Gordon with a new engagement letter after the conclusion of Gordon's rookie contract. Harmon's testimony is consistent with this language. He explained that the Agreement would be in effect for only three or four years and at the conclusion of those years, the parties would enter into a new contract. It seems that Harmon indicated his willingness to provide Gordon with services for the length of Gordon's career, but Harmon's testimony clarifies that the parties did not accede to such terms. Gordon terminated Harmon's services in July 2007 without having negotiated or agreed upon any new contract for the time period beginning after the completion of Harmon's contract with the Bulls.

The basic premise of Harmon's argument on appeal is that there was no need for another negotiation between the parties to extend their business relationship because the April 2006 change in fee structure constituted the new "agreement" on compensation that would last for the duration of Gordon's NBA career. Harmon asserts that his deposition testimony represents the parties' intent at the time they entered into the Agreement in 2004, but that the subsequent change

in the fee structure made a new agreement at the end of Gordon's rookie seasons unnecessary.

Harmon cannot support this contention. There is no evidence in the record that in April 2006, or at any time thereafter, the parties agreed that the new percentage-based fee schedule would last for the duration of Gordon's NBA career or even that it would extend beyond the four seasons specified in the Agreement.[2] In fact, there is direct evidence to the contrary. On April 10, 2007, almost one year after the change in fee structure, Harmon sent Gordon an email addressing, in part, their ongoing debate about the fee change. In the email, Harmon stated, "[y]ou and I have had many discussions about fees in your second contract and have agreed to come up with a working resolution when that time comes, based on the prior history of your account, which I think is more than fair, for the both of us." Dkt. 60, Ex. N at 1. This statement indicates that even after the April 2006 change in the Agreement's

---

[2] In granting summary judgment in Harmon's favor on Gordon's breach of fiduciary duty claim in the *Gordon* lawsuit, the district court concluded that Gordon's payment of fourteen invoices that calculated his fee as a percentage of his income indicated his assent to the fee change. *Gordon v. Vitalis Partners, LLC*, No. 07-CV-6807, 2010 WL 381119, at *3 (N.D. Ill. Jan. 27, 2010) (citing *Forkin v. Cole*, 548 N.E.2d 795, 807 (Ill. App. Ct. 1989)). The district court did not, however, state that Gordon's acquiescence resulted in a new contract or that Gordon had agreed to pay Harmon 1.5% of his salary for the duration of his NBA career.

fee structure, Harmon still anticipated negotiating a second contract with Gordon following his fourth season with the Bulls. The record is clear that the parties never executed such a contract. Consequently, we agree with the district court that the Agreement and undisputed extrinsic evidence show that the parties entered into one contract intended to last for the same length of time as Gordon's rookie contract with the Bulls.

### 2. Harmon is not entitled to damages.

Because the Bulls extended Gordon's rookie contract into a fourth year, the terms of the Agreement required Gordon to pay Harmon for his financial and consulting services through June 2008. However, Gordon terminated Harmon's services in July 2007. In Illinois, when a party repudiates a contract, the other party to the contract "is entitled to recover the value of the contract to him at the time of its breach." *Rankin v. Hojka*, 355 N.E.2d 768, 774 (Ill. App. Ct. 1976). But as the party seeking to recover, the plaintiff must prove that he suffered damage because of the breach and establish the correct measure of damages. *TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 631 (7th Cir. 2007); *Ollivier v. Alden*, 634 N.E.2d 418, 422 (Ill. App. Ct. 1994).

In his complaint, Harmon asserted a damages calculation of $1,254,782.08 on the basis that the parties had entered into a contract to last for the duration of Gordon's career in the NBA. After determining the parties did not intend for the Agreement to last beyond the first four years of Gordon's career, the district court

denied Harmon's motion for summary judgment in its entirety without awarding damages. On appeal, Harmon contends he is entitled to a portion of his calculated damages regardless of the Agreement's duration.

In the district court, Gordon's motion for summary judgment asserted: (1) the Agreement was limited to the three or four years of his rookie contract; (2) Gordon was entitled to terminate the relationship at any time; and (3) Harmon did not sustain any compensable damages. Gordon's motion sought summary judgment as to the entire case. Taken together, those arguments were clear enough and broad enough to require Harmon to present a fallback theory of damages for the fourth year of Gordon's rookie contract in the event that the district court rejected his much more ambitious $1.2 million claim. It was not the district court's responsibility to formulate that fallback theory for Harmon. In his response to Gordon's summary judgment motion, Harmon included only a brief, conclusory footnote indicating that he would be entitled to damages even under Gordon's interpretation of the Agreement's duration. But the footnote did not specify an amount of damages, did not cite any relevant evidence or authority, and did not respond to Gordon's argument that he was entitled to terminate the contract at any time. We have often said that a party can waive an argument by presenting it only in an undeveloped footnote, *see, e.g.*, *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 924 (7th Cir. 2012) (finding waiver); *Long v. Teachers' Ret. Sys. of Illinois*, 585 F.3d 344, 349 (7th Cir. 2009) (same), and we therefore conclude that Harmon waived his argument

for damages for any premature termination of the Agreement. The district court properly entered summary judgment in Gordon's favor on Harmon's breach of contract claim.

## B. Tort Claims

Harmon next argues that the district court erred in dismissing his tortious interference with prospective business advantage claim and his malicious prosecution claim. We address these dismissals in turn.

### 1. Harmon's tortious interference claim is barred by res judicata.

Harmon originally filed his tortious interference claim in the *Gordon* lawsuit, alleging that Gordon made certain false statements to third parties about Harmon's work that interfered with his ability to enter into business relationships with prospective clients. In the *Gordon* lawsuit, the parties did not dispute that California law should apply to Harmon's tortious interference claim, and the district court accepted their agreement. After assessing Harmon's pleadings together with the elements of a California tortious interference cause of action, the district court dismissed the claim. The court explained that Harmon had alleged interference with future relationships rather than alleging interference with future benefits from preexisting relationships, which is a pleading requirement for a tortious interference claim under California law.

Notwithstanding the court's dismissal, Harmon asserted the same tortious interference claim in the present lawsuit, but this time argued at the motion-to-dismiss stage that he had sufficiently alleged a violation of Illinois law. The district court held that res judicata precluded Harmon from reasserting his tortious interference claim and held that he was judicially estopped from arguing that Illinois law applies to his claim. We review a dismissal on res judicata grounds de novo, *Chi. Title Land Trust Co. v. Potash Corp.*, 664 F.3d 1075, 1079 (7th Cir. 2011), and review the district court's application of judicial estoppel for abuse of discretion, *Haschmann v. Time Warner Entm't Co.*, 151 F.3d 591, 605 (7th Cir. 1998).

A federal court sitting in diversity must apply the res judicata principles of the state in which the court is located. *Allan Block Corp. v. Cnty. Materials Corp.*, 512 F.3d 912, 915 (7th Cir. 2008) (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001)). For the application of res judicata, Illinois law requires: (1) "a final judgment on the merits rendered by a court of competent jurisdiction," (2) "an identity of cause of action," and (3) the same parties or their "privies" in both cases. *Hudson v. City of Chicago*, 889 N.E.2d 210, 213 (Ill. 2008). Here, there is no question that Harmon's tortious interference claim involves the same parties as the claim filed in the *Gordon* lawsuit. Thus, we need only consider whether the district court's dismissal of the claim in the *Gordon* lawsuit amounted to a final judgment on the merits and whether the tortious inter-

ference claim asserted under Illinois law in this case presents the "same cause of action."

Harmon represents that the district court dismissed his tortious interference claim in the *Gordon* lawsuit under Federal Rule of Civil Procedure 12(b)(1) for lack of jurisdiction when it entered summary judgment on Gordon's contract and fiduciary duty claims. By the time the district court entered summary judgment in the *Gordon* lawsuit, however, it had already dismissed Harmon's tortious interference claim on the pleadings. In a July 31, 2008 decision, the district court explained that Harmon's allegations were "insufficient to state a cognizable claim of tortious interference" and granted Gordon's motion to dismiss. *Gordon v. Vitalis Partners, LLC*, No. 07-CV-6807, 2008 WL 2961258, at *4 (N.D. Ill. July 31, 2008). Under Illinois law, a "dismissal of a complaint for failure to state a claim is an adjudication on the merits." *River Park, Inc. v. City of Highland Park*, 703 N.E.2d 883, 889 (Ill. 1998).

Contrary to Harmon's assertion, it is of no consequence that the district court did not indicate whether it was dismissing the tortious interference claim with or without prejudice. Unless otherwise stated, dismissals pursuant to Rule 12(b)(6) are deemed to be with prejudice. *Paganis v. Blonstein*, 3 F.3d 1067, 1071 (7th Cir. 1993). The cases Harmon cites addressing dismissals under Rule 12(b)(1) are inapplicable. Res judicata acts to bar Harmon's tortious interference claim as long as it is the same cause of action he asserted in the *Gordon* lawsuit.

Illinois employs a transactional test to determine whether two claims are the same for res judicata purposes. *Chi. Title*, 664 F.3d at 1079-80. Under this test, "separate claims will be considered the same cause of action . . . if they arise from a single group of operative facts, regardless of whether they assert different theories of relief." *Id.* (internal quotation marks omitted). Accordingly, Illinois courts have held that a plaintiff is barred from filing a state law claim arising from the same operative facts as a federal claim that has already been adjudicated on the merits. *River Park*, 703 N.E.2d at 894. In line with this principle, other courts have held that a plaintiff cannot obtain a judgment, favorable or unfavorable, on a claim under one state's law and then later file the same claim under another state's law when the two claims arise from the same operative facts. *See, e.g.*, *Davis Wright & Jones v. Nat'l Union Fire Ins. Co.*, 709 F. Supp. 196, 200 (W.D. Wash. 1989), *aff'd* 897 F.2d 1021 (9th Cir. 1990) (explaining that a plaintiff who received a displeasing judgment under Washington law could not "escape the result of the doctrine of res judicata simply by filing suit in another state where the law may be more accommodating to [its] allegations arising out of the same transaction"); *Smith v. Jenkins*, 562 A.2d 610, 614 & n.5 (D.C. 1989) (barring a claim advanced under District of Columbia law, even though the prior action had framed the same claim as one arising under Maryland law); *see also* Wright, Miller & Cooper, 18 Fed. Prac. & Proc. Juris. § 4411 (2d ed.) ("A second action may be precluded on the ground that the same claim or cause of action was advanced in the first

action even though a different source of law is involved. Claim preclusion may apply to theories advanced . . . under the laws of different sovereigns.").

In formulating his tortious interference claim in his complaint in this case, Harmon pled the same facts that supported the claim he asserted in the *Gordon* lawsuit. He then applied Illinois law in responding to Gordon's motion to dismiss. Although a tortious interference claim asserted under California law has stricter pleading and substantive requirements than the same claim asserted under Illinois law,[3] a party cannot simply refile a losing claim under a law with more favorable requirements. If the relitigation of such claims were allowed, plaintiffs could avoid the effects of res judicata by repleading unsuccessfully adjudicated claims and arguing for the application of a different state's law.[4]

---

[3] Under California law, the tort of interference with prospective business advantage requires the plaintiff to plead "the existence of a business relationship with which the tortfeasor interfered." *Roth v. Rhodes*, 30 Cal. Rptr. 2d 706, 715 (Cal. Ct. App. 1994). In Illinois, however, a plaintiff need only allege that he had a reasonable expectation of entering into a business relationship. *Cook v. Winfrey*, 141 F.3d 322, 327 (7th Cir. 1998).

[4] In most cases, collateral estoppel will prevent a party from arguing for the applicability of a state law that differs from the law a court applied to the same claim in a previous action. *See* Wright, Miller & Cooper, 18 Fed. Prac. & Proc. Juris. § 4417

(continued...)

Having determined that the tortious interference claim in this case presents the same cause of action involving the same parties as the claim the district court dismissed on the merits in the *Gordon* lawsuit, we conclude that the district court properly dismissed the claim on res judicata grounds. Because res judicata bars the re-assertion of the same claim even under Illinois law, we need not address whether the district court abused its discretion in applying judicial estoppel.

### 2. Harmon did not plead special damages required for a malicious prosecution claim.

Harmon's final argument is that the district court erred in dismissing his malicious prosecution claim for failure to state a claim. A party asserting a cause of action for malicious prosecution in Illinois must allege facts

---

[4] (...continued)
(2d ed.) ("If successive actions are brought between the same parties in the same forum, arising out of the same rela-tionships, a choice-of-law determination should often be established by issue preclusion."). In Illinois, however, collateral estoppel is "limited to the precise factual or legal issues actually litigated and decided when a prior order was entered." *People v. Williams*, 563 N.E.2d 385, 392 (Ill. 1990). "Actually litigated" means "that the parties disputed the issue and the trier of fact resolved it." *Taylor v. Peoples Gas Light & Coke Co.*, 656 N.E.2d 134, 141 (Ill. 1995). Here, collateral estoppel does not preclude Harmon from asserting the ap-plicability of Illinois law because the parties did not dispute that California law governed in the *Gordon* lawsuit.

establishing: (1) that the defendant brought an action against the plaintiff maliciously and without probable cause; (2) that the action was terminated in favor of the plaintiff; and (3) that "the plaintiff suffered 'special injury' or special damage beyond the usual expense, time, or annoyance in defending a lawsuit." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 602 (7th Cir. 1995) (citing *Levin v. King*, 648 N.E.2d 1108, 1110 (Ill. App. Ct. 1995)). Here, Harmon alleged that Gordon had maliciously filed his breach of fiduciary duty claim in the *Gordon* lawsuit and that Harmon had incurred costs and lost business as a result. Without discussing the other elements of the tort, the district court dismissed the malicious prosecution claim because it found that Harmon's alleged damages did not amount to anything more than the usual expense and inconvenience associated with defending a lawsuit. We review the district court's dismissal de novo. *Cler v. Ill. Educ. Ass'n*, 423 F.3d 726, 729 (7th Cir. 2005).

The special injury rule reflects the responsibility of courts "to maintain a proper balance between the societal interest in preventing harassing suits and in permitting the honest assertion of rights in [court]." *Cult Awareness Network v. Church of Scientology Int'l*, 685 N.E.2d 1347, 1356 (Ill. App. Ct. 1997). In nearly all malicious prosecution cases in which Illinois courts have found a special injury, "the nature of the underlying suit visited upon the plaintiff some quantifiable damage causing characteristic." *Levin*, 648 N.E.2d at 1111. These injuries have generally resulted from "an arrest or

seizure of property or some constructive taking or interference with the person or property." *Id.* at 1110.

In *Equity Associates, Inc. v. Village of Northbrook*, 524 N.E.2d 1119 (Ill. App. Ct. 1988), an Illinois appellate court affirmed the dismissal of the plaintiffs' malicious prosecution claim because the plaintiffs did not allege special injury beyond the damages generally sustained in defending a lawsuit. *Id.* at 1122–24. In that case, the real estate developer plaintiffs alleged damages including the loss of potential tenants, the loss of potential institutional lending commitments, the inability to develop certain property, attorneys' fees and other costs, and damage to the plaintiffs' reputation. *Id.* at 1123. The plaintiffs asserted that their alleged property interference was sufficient to establish special injury, but the court explained that the plaintiffs' property had never been "subjected to the control of the court," and thus had not been "actually [or] constructively seized as a result of [the] suit." *Id.* The court further explained that "[i]t is a physical disturbance to property, not the prevention of its physical development, which constitutes damage requiring just compensation." *Id.* at 1124.

The damages Harmon alleged in his malicious prosecution complaint include extensive negative publicity, loss of existing clients and an inability to attract new clients, attorneys' fees, and litigation costs. Like in *Equity Associates*, these alleged damages do not exceed what any other individual or company defending a breach of fiduciary duty suit might experience. In such

a case, it is reasonable for the defendant to expect to be subject to negative publicity, and in turn, experience a loss of present or future clients. Like in any other civil case, a defendant should also anticipate paying attorneys' fees and litigation costs. Moreover, in filing the lawsuit, Gordon's purpose was to obtain a judgment for damages against Harmon. He did not "seek to enjoin [Harmon's] conduct, attach his property, repetitiously litigate the same issue, or oppressively force [Harmon] to defend a controversy that had been judicially determined." *Levin*, 648 N.E.2d at 1112.

Harmon nonetheless contends that the balance between permitting the honest assertion of rights and preventing harassing suits has been upset. In the case Harmon cites in support of this argument, however, the court did not find special damages in the plaintiff's malicious prosecution complaint and it distinguished cases in which a malicious prosecution defendant had filed an excessive number of consecutive lawsuits against a plaintiff. *See Howard v. Firmand*, 880 N.E.2d 1139, 1142 (Ill. App. Ct. 2007). Harmon did not experience any comparable harassment here and none of his alleged damages go beyond the normal injury associated with defending a lawsuit. The district court appropriately granted Gordon's motion to dismiss.

### III.  Conclusion

For these reasons, we AFFIRM the district court's grant of summary judgment in Gordon's favor and AFFIRM

the district court's dismissal of Harmon's tortious inter-
ference and malicious prosecution claims.