Filed 3/16/15  Wallner v. Biggs-Gridley Memorial Hospital CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| JAMES WALLNER, | C075599 |
| Plaintiff and Appellant, | (Super. Ct. No. 156664) |
| v. | |
| BIGGS-GRIDLEY MEMORIAL HOSPITAL, | |
| Defendant and Respondent. | |

After less than a year of employment as the director of pharmacy for defendant Biggs-Gridley Memorial Hospital (the hospital), plaintiff James Wallner was fired.  The hospital said it was for poor job performance; Wallner claims it was retaliation for his complaint that his supervisor had sexually harassed him.  When Wallner sued the hospital for retaliation and termination in violation of public policy, the trial court granted summary judgment in favor of the hospital on the ground that Wallner had "not submitted evidence sufficient to create a triable issue of fact as to whether [the hospital's] stated reasons for terminating his employment were pretextual."  The trial court also rejected

1

Wallner's request for a continuance to conduct further discovery because Wallner failed to show that the evidence he expected to find would have any bearing on "the state of mind of the [hospital] in terminating him."

On Wallner's appeal, we agree with the trial court and therefore affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Wallner was hired to work as the hospital's director of pharmacy beginning in June 2009. In that role, Wallner had overall accountability for the effective, legal, ethical, and responsible operations of the pharmacy department, and he was responsible for helping the hospital shape up existing problems. Among other things, Wallner was responsible for ensuring that drugs at various locations in the hospital were stocked and not out of date.

In November 2009, Phil Pooley became Wallner's direct supervisor. In turn, Pooley was supervised by David Yarbrough, CEO of the hospital.

Soon after Pooley began supervising Wallner, Pooley began reporting to Yarbrough isolated problems that Pooley was observing and that other employees were reporting to Pooley about Wallner's performance. As time went on, the number of performance issues reported to Yarbrough by hospital personnel, as well as the severity of those issues, increased.

In early May 2010, the hospital engaged another licensed pharmacist, Julie Allen, to cover the pharmacy department several days in a row while Wallner was absent from work. On May 7, at the end of Allen's work week, Allen sent an e-mail to Pooley regarding multiple incidents she had found of expired medications, syringes, and other supplies stored in various locations that were Wallner's responsibility.

Yarbrough reviewed Allen's e-mail shortly after Pooley received it. Thereafter, Yarbrough asked Pooley to compile a list of Wallner's performance deficiencies to present to Wallner at a disciplinary meeting and also asked Pooley to offer Wallner the opportunity to resign at the meeting. Subsequently, Pooley showed Yarbrough a two-

2

page document that documented 11 instances of Wallner's unsatisfactory job performance between September 2009 and May 2010.

The disciplinary meeting with Wallner took place on May 21, 2010. In addition to Wallner and Pooley, the meeting was attended by the director of nursing, Cathy Smith, who had been Wallner's supervisor before Pooley and who continued to have considerable involvement with pharmacy matters. At the meeting, Pooley presented the list of performance deficiencies to Wallner. At some point during the meeting, Wallner asserted that Pooley had sexually harassed him, and he asked to speak with the hospital's sexual harassment officer. The meeting was adjourned so that Wallner could file a harassment complaint, which he did that day. In his complaint, Wallner alleged that Pooley had grabbed his breast three to eight weeks before May 21 and, before that, had threatened to make his job a living hell.

Wallner was placed on paid administrative leave beginning May 25 to allow for the investigation of his harassment allegation. The hospital arranged for Allen to fill in for him. As part of her assumption of Wallner's duties, Allen, along with Smith, immediately conducted a narcotic inventory. Following that inventory, Allen reported that she and Smith had found irreconcilable overages or shortages of 14 controlled substances in two different locations. The same day (May 25), Allen reported to Pooley that Wallner had not conducted several required monthly inventories for various drugs in several locations. Yarbrough reviewed that report, and based on the new issues raised by Allen, as well as the previously identified performance issues identified by Pooley in the list given to Wallner at the disciplinary meeting, Yarbrough decided to terminate Wallner's employment at the hospital.

Meanwhile, the hospital's human resources manager, Rexann Simmons, conducted an investigation of Wallner's sexual harassment allegation. She interviewed Smith and a pharmacy technician, Cynthia Anderson, both of whom said they had never noticed any inappropriate behavior by Pooley. She also interviewed Pooley, who denied

3

the allegation. Simmons and Yarbrough agreed that the alleged conduct would be out of character for Pooley. On his computer, Yarbrough reviewed all security camera recordings in existence and found no recording of Pooley and Wallner together, or any suspicious behavior by either of them. Ultimately, Yarbrough decided that Wallner had fabricated the allegation of harassment to deflect the upcoming disciplinary action for his performance deficiencies.

Yarbrough notified Wallner that his employment with the hospital was terminated effective May 27, 2010 "based upon the severity of the performance issues, the lack of improvement when issues were brought to [Wallner's] attention and the discovery this week of additional serious problems in the pharmacy."

In May 2012, Wallner commenced this action by filing a complaint against the hospital and Pooley. Wallner's causes of action for harassment, discrimination, and failure to prevent harassment were disposed of by a motion for judgment on the pleadings, leaving only his causes of action against the hospital for retaliation and wrongful termination in violation of public policy.

In July 2013, the hospital moved for summary judgment on the ground that Wallner could not establish that the hospital acted with retaliatory intent in terminating his employment or that he had engaged in protected activity (on the theory that a false report of harassment is not protected). In addition to opposing the motion on its merits, Wallner requested that the court postpone ruling on the motion until he had the opportunity to conduct necessary discovery.

The trial court determined that the hospital had met its initial burden of showing that it terminated Wallner's employment for valid reasons related to his job performance. The court further concluded that Wallner had "not submitted evidence sufficient to create a triable issue of fact as to whether [the hospital's] stated reasons for terminating his employment were pretextual." On that basis, the trial court granted summary judgment to the hospital. The court denied Wallner's request to postpone ruling on the motion to

4

allow him to conduct discovery because of Wallner's "failure . . . to show what evidence he believe[d] he could obtain, what efforts he ha[d] made to obtain it, . . . and, most importantly, how it would change the outcome of the case."

From the resulting judgment, Wallner timely appealed.

DISCUSSION

On appeal, Wallner contends he presented sufficient evidence to establish both retaliation and that he engaged in protected activity, and he contends the trial court should have postponed ruling on the motion for summary judgment to allow him to conduct necessary discovery. We agree with the trial court that Wallner's case is without merit because he failed to raise a triable issue of fact as to whether the hospital's stated reasons for terminating his employment were pretextual.[1] We also conclude that the trial court did not abuse its discretion in refusing to postpone ruling on the summary judgment motion to allow Wallner to conduct further discovery.

I

*Pretext*

It is unlawful under the Fair Employment and Housing Act (FEHA) for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under [the FEHA] or because the person has filed a complaint, testified, or assisted in any proceeding under" the FEHA. (Gov. Code, § 12940, subd. (h).) Here, the hospital presented evidence in support of its summary judgment motion that it did not terminate Wallner's employment because he complained that Pooley sexually harassed him, but rather because of his poor job performance. Under these circumstances, "to avoid summary judgment, [Wallner] had to ' "offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse

---

[1] Because there is no triable issue of pretext, like the trial court, we need not address whether Wallner engaged in protected activity.

5

action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination." ' [Citation.] An employee in this situation can not 'simply show the employer's decision was wrong, mistaken, or unwise. Rather, the employee " 'must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," [citation], and hence infer "that the employer did not act for the [ . . . asserted] non-discriminatory reasons." ' " ' " (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 75.)

As best we can glean, Wallner's argument that the hospital's stated reasons for terminating his employment were pretextual can be summarized as follows: First, the hospital terminated his employment only six days after he filed his sexual harassment complaint. Second, the hospital "attempted to cover its tracks by denying [him] the ability to perform a final [narcotic] count with his replacement Dr. Allen," which allowed the hospital to "make claims after the fact about lost supplies and medications." Third, his "close colleague was asked not to testify against" the hospital. Fourth, the asserted reasons for his termination "consisted of a list of minor offenses such as 'avoiding overtime' and 'losing keys,' " and "the bulk of these offenses occurred near the beginning of his employment." Fifth, "the termination occurred *before* the hospital was notified of the missing medications." We address each of these "facts" in turn.

A

*Temporal Proximity Of Discipline To Protected Activity*

Wallner suggests the temporal proximity between his report of the sexual harassment by Pooley and the termination of his employment supports a finding of pretext. While it is true Wallner's employment was terminated six days after he filed his sexual harassment complaint, that fact cannot be viewed in isolation from the other

6

surrounding circumstances, which were that: (1) Wallner's employment was also terminated six days after the hospital tried to get him to resign because of what the hospital asserted were numerous instances of poor job performance; and (2) Wallner's termination followed even more swiftly on the heels of the discovery of numerous discrepancies in a count of narcotics at the facility. Both of these circumstances significantly undercut any inference that the termination was causally related to the sexual harassment complaint, especially since Wallner first raised the allegation of sexual harassment in the disciplinary meeting that was called to address his poor job performance. Additionally, it must be noted that temporal proximity between the protected action and the adverse employment decision, by itself, will not suffice to show pretext. (*Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1112.) Accordingly, the six-day period does not carry much weight in showing that the hospital's stated reasons for firing Wallner were pretextual.

B

*The Final Narcotic Count*

Wallner next suggests pretext is shown by the fact that the hospital denied him the ability to perform a final narcotic count with Dr. Allen and thereby "attempted to cover its tracks." That assertion might have persuasive force if the evidence Wallner cited had any tendency in reason to suggest that, by its action, the hospital was trying to falsely create a pretextual reason to fire Wallner, but the evidence does not suggest that. Wallner asserted in his declaration that he "was unable [to perform] and prevented from performing a final count of medications at the hospital with . . . Dr. Allen," and "[a]s a result, she was likely unaware of the locations of substances and supplies kept at the hospital." At his deposition he testified that because Dr. Allen was not "oriented by [him] or any other pharmacist as to the location of all the medications in the pharmacy, it is very possible and probable that she did not find all the medications and could not

7

resolve the count." He also testified that he "could not have found all the drugs until [his predecessor] oriented [him]."

With regard to Wallner's assertion that he was "prevented" from performing a final narcotic count with Dr. Allen, Wallner offers no *evidence* of how he was prevented from doing so, and thus we are left only with Yarbrough's testimony that Wallner was placed on administrative leave "so that an investigation of his allegations could take place without him feeling uncomfortable during the process," and the hospital arranged for Dr. Allen to oversee the pharmacy in his absence. Wallner points to no evidence from which a trier of fact could reasonably infer that the hospital made this arrangement for the purpose of "prevent[ing]" Wallner from participating in a final narcotic count or from "orient[ing]" Dr. Allen as to where the narcotics were kept. At best, the evidence supports only the conclusion that Wallner was "unable" to participate in the count and unable to orient Dr. Allen because he was on administrative leave. But no nefarious inference can reasonably be drawn from this circumstance. At most, Wallner's evidence might support an inference that Dr. Allen mistakenly failed to find all of the narcotics because of her lack of orientation, but any such inference does not have any tendency in reason to support Wallner's assertion that the hospital "attempted to cover its tracks" by creating a pretextual reason for terminating his employment.

It also should be noted that even the relatively benign inference that Dr. Allen mistakenly failed to find all of the narcotics because Wallner did not get the opportunity to orient her is weak at best. Dr. Allen noted 11 shortages (not to mention three *overages*) in "the Gray Narcotic Cabinet" and two additional shortages in the "Narcotic Night Drawer." The shortages in the cabinet included 20 syringes, 100 Ambien tablets, 33 Ativan tablets, 69 Restoril capsules, and 100 Xanax tablets; and the shortages in the drawer included 22 Restoril capsules and 30 Ambien tablets. In opposing the summary judgment motion, Wallner made no attempt to explain how so many syringes, capsules,

8

and tablets could have been simply "missed" by Dr. Allen in what appear to have been two locations of limited dimension (a cabinet and a drawer).

For all of the foregoing reasons, the evidence regarding the final narcotic count also does not carry much weight in showing that the hospital's stated reasons for firing Wallner were pretextual.

C

*Request Not To Testify*

Wallner asserts that the hospital "tried to cover up its dishonest steps by even going so far as to approach Ms. Anderson [the pharmacy technician] and asking her not to testify in the matter." As the trial court found, however, "[t]his does not appear in the record." What *does* appear in this record is an excerpt from Anderson's deposition, in which she testified as follows when asked what Yarbrough told her Wallner had alleged against Pooley:

"[H]e had said it was a sexual harassment, that [Pooley] had -- or that Mr. Wallner had said that [Pooley] grabbed his breasts. And I went: Huh? And anyway, [Yarbrough] asked me to write what [Wallner] had said when he left. And [Yarbrough] said if anything came of this, would I be willing to, you know, say -- was I willing to -- not testify, but -- I don't know what I want to say."

The attorney conducting the examination of Anderson then asked, "Willing to explain?" but Anderson's response to that question is not included in the record on appeal because Wallner's attorney did not attach the next page from the deposition transcript to his declaration in opposition to the summary judgment motion. Nevertheless, from what we *do* have we can readily discern -- just as the trial court did -- that Anderson was *not* testifying (as Wallner contends) that Yarbrough asked her "not to testify in the matter." On the contrary, it appears Yarbrough simply asked Anderson if she would be willing to tell what she knew "if anything came of this." Obviously, nothing about Anderson's testimony -- properly understood -- supports an inference of pretext.

9

D

*Performance Deficiencies*

Wallner next suggests that pretext is demonstrated by the fact that the "performance issues" Pooley identified in the document presented to Wallner at the disciplinary meeting "consisted of a list of minor offenses," "the bulk of which occurred near the beginning of his employment." We are not persuaded.

As to the timing of the incidents, three were from September 2009, one was from October 2009, one was from February 2010, four were from March 2010, and two were from May 2010. That puts four of the 11 incidents in the first two months of Wallner's nine months of employment, and the other seven incidents in the last four months. Clearly, the bulk of the incidents occurred closer to the *end* of Wallner's employment than to the beginning, and Wallner's assertion to the contrary is simply wrong.

As to whether the incidents amounted to "minor offenses," Wallner fails to give us any basis on which we could agree with his characterization; he simply asserts that the incidents were "minor" and expects us to accept his characterization. That we cannot do. This is especially true when one of the two incidents that Wallner specifically asserts was "minor" -- "losing keys" -- involved Wallner losing his keys to the outer and inner doors of the pharmacy, " 'probably . . . after [an] airline flight to Los Angeles or upon arrival in Los Angeles,' " and failing to take any corrective action on his own initiative. In fact, it was a full two weeks before the matter was rectified -- apparently by replacing or rekeying the locks -- and that occurred only because Pooley was apprised of the situation by Wallner's coworkers. Putting the security of the pharmacy medications in jeopardy for such an extended period of time can hardly be characterized as "minor." At the very least, Wallner has not shown that the hospital was reasonably bound to treat it as such. Accordingly, nothing about the nature and timing of the performance deficiencies the hospital asserted against Wallner tends to show that the hospital's stated reasons for firing him were pretextual.

10

## E

### *Timing Of Termination With Respect To Discovery Of Missing Narcotics*

Finally, Wallner suggests he has shown pretext because "the termination occurred *before* the hospital was notified of the missing medications." This assertion is not supported by any cite to the record, and in fact it is plainly false. The undisputed evidence, which we have recounted already, showed that Yarbrough did not terminate Wallner's employment until after Allen had reported the missing narcotics, and indeed Yarbrough based his decision in part *on* those missing narcotics.

## F

### *Conclusion*

Because all of Wallner's arguments regarding pretext are without merit, we agree with the trial court that Wallner failed to produce any evidence sufficient to raise a triable issue of fact as to whether the hospital's stated reasons for terminating his employment were pretextual. Accordingly, Wallner's claims against the hospital were without merit, and the hospital was entitled to summary judgment based on the evidence before the trial court.

## II

### *Postponement Of Ruling On Summary Judgment Motion*

"If it appears from the affidavits submitted in opposition to a motion for summary judgment . . . that facts essential to justify opposition may exist but cannot, for reasons stated, then be presented, the court shall deny the motion, or order a continuance to permit affidavits to be obtained or discovery to be had or may make any other order as may be just." (Code Civ. Proc., § 437c, subd. (h).)

Here, Wallner contends "the trial court should have deferred ruling on [the summary judgment motion] until [he] had had an opportunity to conduct the necessary discovery for this case." At no point, however, does Wallner make any effort to demonstrate that "facts essential to justify opposition" to the summary judgment motion

11

might have existed but could not then be presented. Instead, without providing any citation to the record, he references assertions in his declaration that "prior counsel ignored [his] requests that they conduct certain types of discovery," which "severely jeopardized [his] interests" and "left [him] in a position in which his opportunity to vindicate his rights and have a jury adjudicate the issues he raised has been severely jeopardized or prejudiced."

This argument is patently insufficient to show any error in the trial court's denial of a continuance. "It is not sufficient under the statute merely to indicate further discovery or investigation is contemplated. The statute makes it a condition that the party moving for a continuance show 'facts essential to justify opposition may exist.' " (*Roth v. Rhodes* (1994) 25 Cal.App.4th 530, 548.) Wallner has not satisfied that condition here. Our own review of his declaration shows that while he listed numerous categories of documents that his prior attorneys failed to request or obtain, he made no effort to explain what "facts essential to justify opposition" he believed could be proven by those documents. Under these circumstances, "[t]he trial court was fully justified in finding the declaration insufficient to support a continuance." (*Ibid.*)

### DISPOSITION

The judgment is affirmed. The hospital shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

                                                                ROBIE         , Acting P. J.

We concur:

       MAURO       , J.

       DUARTE     , J.