Filed 8/9/16  Trinity River Lumber Co. v. Weaverville Community Services Dist. CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| TRINITY RIVER LUMBER COMPANY, | C074550 |
| Plaintiff and Appellant, | (Super. Ct. No. 169565) |
| v. | |
| WEAVERVILLE COMMUNITY SERVICES DISTRICT et al., | |
| Defendants and Respondents. | |
| UNITED NATIONAL INSURANCE COMPANY, | (Super. Ct. No. 170236) |
| Plaintiff and Appellant, | |
| v. | |
| WEAVERVILLE COMMUNITY SERVICES DISTRICT et al., | |
| Defendants and Respondents. | |

Following a devastating fire at a lumber mill, the mill's owner, Trinity River

Lumber Company, and its insurer, United National Insurance Company (United), sued

1

Weaverville Community Services District (District) for damages caused by the fire. Several months before the fire, the District's contractor repaired two leaking valves in the mill's backflow assembly. After completing the repair, the contractor tested the backflow assembly and substantially closed one of the valves in the process. When the test was completed, the contractor negligently failed to fully re-open the valve, and as a result, there was an inadequate supply of water to the mill's fire suppression system, including its automatic sprinkler system and fire hoses, at the time of the fire.

The trial court granted the District's motion for summary judgment and entered judgment in the District's favor. It found that the District was immune from tort liability under Government Code[1] section 850.4, which immunizes public entities from liability "for any injury resulting from the condition of fire protection or firefighting equipment or facilities," the breach of contract cause of action failed because "there is no evidence of any contract to provide fire protection," and the breach of warranty causes of action failed because the essence of the contract alleged in the pleadings was for services, not goods. The trial court also ruled that plaintiffs could not defeat summary judgment by claiming the District's failure to require the mill to install a dedicated fire service line constituted an inverse condemnation where no such action had been alleged in the pleadings.

Plaintiffs appeal from the judgment for the District. Their primary contention on appeal is that the trial court erred in concluding the District was immune under section 850.4 because it is undisputed that the valve in question was privately owned and located on private property. Plaintiffs also dispute the trial court's findings with respect to the remaining causes of action.

---

[1] Further undesignated statutory references are to the Government Code.

We shall conclude that the trial court properly determined that the closed valve constituted a "condition of fire protection or firefighting equipment or facilities" within the meaning of section 850.4, and thus, the District is immune from tort liability under section 850.4. Accordingly, we shall conclude that summary judgment was properly entered as to the negligence causes of action on that basis. We shall further conclude that summary judgment was properly entered on the remaining causes of action, the trial court properly determined that plaintiffs could not defeat summary judgment by asserting that the District's failure to require the mill to install a dedicated fire suppression line constituted an inverse condemnation. Accordingly, we shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On September 12, 2009, a small fire broke out at the mill. Although the fire was such that it should have been contained by the mill's fire protection equipment, including the automatic sprinkler system and fire hoses, a lack of water pressure allowed the fire to engulf the mill, causing approximately $30 million in damages. After the fire, it was determined that one of the two valves in the mill's backflow assembly, which serviced its automatic sprinkler system and fire hoses, was substantially closed.

The mill obtained its water from the District, a California special district formed under the provisions of the Water Code to provide water to the community of Weaverville. The District supplied the mill with water through an eight-inch "fire service connection," which was connected to the main water line located at the street. The mill received water for its domestic, industrial, and fire suppression needs through the fire service connection. The District provided the water and the fire service connection to the mill at ordinance rates.

The fire service connection belonged to the District and was located outside the mill. Water from the fire service connection travelled through the mill's backflow assembly, which was housed in an underground area of the mill known as "the vault." The vault and equipment therein, including the backflow assembly, were the private

3

property of the mill.  The backflow assembly consisted of two backflow devices and two water gate valves on either side of the backflow devices.  The purpose of a backflow device is to prevent contaminated water from entering the public water supply.  (Cal. Code Regs., tit. 17, § 7604.)

Pursuant to subdivision (a) of section 7605 of title 17 of the California Code of Regulations (Testing & Maintenance of Backflow Preventers), the District "shall assure that adequate maintenance and periodic testing are provided by [water users like the mill] to ensure their proper operation."  The District must assure that backflow devices are tested annually, and when they are found to be defective, they are repaired or replaced, and tested immediately thereafter.  (*Id.* at subds. (b)-(d).)

In December 2008, the District sent its backflow device testing contractor Northwood Backflow Services (Northwood) to test the mill's backflow devices.[2]  Northwood determined that both of the mill's backflow devices failed its annual test in that both check valves one and two had leaked, and advised the District that the devices were defective.  In January 2009, the District wrote to the mill and advised:  "During our last round of annual testing, it was determined that your backflow device has failed.  Our backflow device testing contractor has provided the attached estimate to repair your device.  This condition needs to be corrected as soon as possible.  Please contact us to either authorize the repair by our contactor or provide us . . . with documentation of the repair and subsequent testing by your certified backflow device contactor."  The attached estimate, prepared by Northwood, estimated the cost of the repair at $823, including three hours of labor, rubber parts, and a bronze seat kit.  The mill issued a check in the amount of $823 to the District for the repair, and on March 6, 2009, Northwood performed the repair, which included cleaning valves one and two and replacing discs.  Thereafter, it

---

[2]  From 2006 through 2008, Northwood tested at least 398 backflow devices on the District's behalf.

tested the mill's backflow assembly and advised the District that it had passed the annual testing. During the testing procedure, Northwood closed one of the two check valves and then re-opened it one and one-half out of a possible 21 turns.[3]

On March 22, 2009, Northwood invoiced the District $478, the actual cost to repair the mill's backflow assembly. The final cost was less than the estimate because a replacement part included in the estimate (a bronze seat kit) was not ultimately needed. On September 30, 2009, the District refunded the mill $345 for its overpayment for the repair.

During the fire on September 20, 2009, the mill's sprinkler system activated in response to the smoke generated by the fire, but it did not release a sufficient amount of water to suppress the fire. Multiple employees at the mill attempted to extinguish the flames using fire hoses, but the hoses similarly failed to release a sufficient amount of water. It was later determined that one of the two valves in the backflow assembly was open only one and one-half of a possible 21 turns, rendering it substantially closed. There was no indication prior to the fire that the valve was substantially closed. The water that did get through was enough to run the bathrooms and hose bibs and to cool the saws.

United paid for the bulk of the fire loss with insurance policy proceeds. The mill filed suit to recover its uninsured loss, and United filed a separate action seeking subrogation recovery of insurance policy benefits paid to its insured. The cases later were consolidated.

The operative third amended complaints asserted causes of action for negligence, breach of contract, breach of the implied warranty of merchantability, and breach of the

---

[3] For purposes of the summary judgment motion, the District does not dispute plaintiffs' claim that the District is vicariously liable for the acts of Northwood, or that Northwood negligently failed to fully re-open the valve after completing the testing.

implied warranty of fitness against the District, Northwood, and others. The complaints alleged, inter alia, that the District was negligent in that it breached its duties to supply water as needed and to properly test, maintain, and repair the water system to the mill when its employees, agents, or contractors substantially shut off the mill's water supply to its fire suppression system and failed to restore it to proper operating pressure and volume. But for the District's breach, the fire would have been contained and would not have engulfed the entire mill.[4]

The complaints further alleged that the mill entered into an oral agreement with the District whereby the District agreed to provide inspection, testing, servicing, installation, maintenance, and repairs to the mill's water system, to perform such services in a competent manner, and to provide good and proper materials for completion of such services, and that the District breached that agreement by failing to provide competent services and proper materials and restore water pressure and/or volume to the mill. As a result of the breach, the mill was damaged.

Finally, the complaints alleged that the District breached the implied warranties of merchantability and fitness in that the "backflow valve system" the mill purchased from the District was not fit for the ordinary purpose for which it was used, or the particular purpose of permitting and controlling adequate water volume and pressure in the mill's facilities.

The District moved for summary judgment on plaintiffs' complaints on the grounds: (1) the District was immune from tort liability under section 850.4; (2) the District was not liable on a breach of contract theory because there was no express agreement for fire protection; (3) the implied warranties of merchantability and fitness

---

[4]   The complaints also alleged that the mill exhausted its administrative remedies by timely presenting a claim for damages to the District pursuant to sections 905 and 910, and that the District rejected the claim.

apply only to goods, and the agreement at issue here involved a service. Plaintiffs opposed the motion on the merits and also on the ground that the District's separate statement of undisputed material facts failed to comply with the Rules of Court for summary adjudication.[5] The trial court denied the motion for summary judgment "on purely a procedural basis," and indicated that the District could bring another motion in a "corrected form."

Thereafter, the District filed a second motion for summary judgment, raising the same issues. Plaintiffs objected, arguing that the second motion was an improper successive motion under Code of Civil Procedure section 437c, subdivision (f)(2). The trial court overruled the objections, noting that the "prior motion [was] denied for procedural reasons -- not on the merits." The trial court granted the motion for summary judgment, and entered a judgment in the District's favor.

DISCUSSION

The standard of review for an order granting a motion for summary judgment is de novo. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 (*Aguilar*).) We apply the same three-step process as the trial court. "Because summary judgment is defined by the material allegations in the pleadings, we first look to the pleadings to identify the elements of the causes of action for which relief is sought. . . . We then examine the moving party's motion, including the evidence offered in support of the motion." (*Baptist v. Robinson* (2006) 143 Cal.App.4th 151, 159.) A defendant moving for summary judgment has the initial burden of showing that a cause of action lacks merit because one or more elements of the cause of action cannot be established or there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (p)(2); *Teselle v. McLoughlin* (2009) 173 Cal.App.4th 156, 168-169.) If the defendant fails to make this

---

[5]  Plaintiffs joined in each other's arguments below and on appeal.

7

initial showing, it is unnecessary to examine the plaintiff's opposing evidence and the motion must be denied. (Code Civ. Proc., § 437c, subd. (p)(2); *Teselle*, at p. 169.) However, if the moving papers make a prima facie showing that justifies a judgment in the defendant's favor, the burden shifts to the plaintiff to make a prima facie showing of the existence of a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2); *Teselle*, at p. 169.)

In determining whether the parties have met their respective burdens, the court must " 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom [citation], and must view such evidence [citations] and such inferences [citations], in the light most favorable to the opposing party." (*Aguilar*, *supra*, 25 Cal.4th at p. 843, fn. omitted.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Id.* at p. 850, fn. omitted.)

As a preliminary matter, we reject plaintiffs' claim that the District's second motion for summary judgment should have been denied because it presented no new facts, circumstances, or law. While "[Code of Civil Procedure] sections 437c and 1008 limit the parties' ability to file repetitive motions," they "do not limit the court's ability, on its own motion, to reconsider its prior interim orders so it may correct its own errors." (*Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1107.) Here, the record supports the conclusion that the trial court effectively sua sponte reconsidered its prior order denying the District's motion for summary judgment. (See *Nieto v. Blue Shield of California Life & Health Ins. Co.* (2010) 181 Cal.App.4th 60, 74.) At the hearing on the District's initial motion for summary judgment, the trial court ruled that the motion was "denied on purely a procedural basis," and indicated that it would permit the District "to bring another motion." Thus, at the time it denied the initial summary judgment motion, the trial court had already determined that it would reconsider its order if the District refiled the motion

8

with a properly formatted separate statement. "That reconsideration may have been prompted by a motion filed in violation of Code of Civil Procedure section 437c, subdivision (f)(2) did not alter the trial court's inherent authority to reconsider its prior order denying summary judgment." (*Ibid.*)

I

Summary Judgment Was Properly Entered in the District's Favor as to the
Negligence Causes of Action

Plaintiffs contend that the trial court erred in concluding that the District is immune from suit because (1) the closed valve "was completely located on private property and completely privately owned by [the mill]," and (2) the District was not involved in "firefighting activity" when it agreed to repair it. As we shall explain, the valve in question was part of the water system used to furnish water to fight fires and as such constituted "firefighting equipment or facilities" within the meaning of section 850.4. (*Lainer Investments v. Department of Water & Power* (1985) 170 Cal.App.3d 1, 8 (*Lainer*).) Moreover, the fact that the District was not involved in firefighting activity when it agreed to repair the backflow assembly is irrelevant because such involvement is not required under the provision of section 850.4 at issue here. Accordingly, the trial court properly determined that the District is immune from tort liability under section 850.4, and summary judgment was properly entered as to the negligence causes of action on that basis.

Under the Government Claims Act, governmental immunity is the rule, and liability is the exception. (*Teter v. City of Newport Beach* (2003) 30 Cal.4th 446, 451.) Generally, a tort action may not be maintained against a public entity unless the claim is based on a statute providing for liability. (§ 815.) One such statute is section 815.2. Subdivision (a) of that section provides: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a

9

cause of action against that employee or his personal representative." (§ 815.2, subd. (a).)[6] Subdivision (b) of that section underscores that: "Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability."

Section 850.4 provides: "Neither a public entity, nor a public employee acting in the scope of his employment, is liable for any injury resulting from the condition of fire protection or firefighting equipment or facilities or, except as provided in Article 1 (commencing with Section 17000) of Chapter 1 of Division 9 of the Vehicle Code, for any injury caused in fighting fires." "Section 850.4 provides for absolute immunity from liability for injury caused . . . from failure to properly maintain fire protection equipment or facilities." (Recommendation Relating to Sovereign Immunity, Number 1 – Tort Liability of Public Entities and Public Employees (Jan. 1963.) 4 Cal. Law Revision Com. Rep. (1963) p. 862.) Courts, including our Supreme Court, have interpreted section 850.4 broadly in favor of immunity, holding that the phrase "fire protection or firefighting equipment or facilities" includes valves in water systems used to furnish water to fight fires. (See *Heieck & Moran v. Modesto* (1966) 64 Cal.2d 229 (*Heieck*); *New Hampshire Ins. Co. v. City of Madera* (1983) 144 Cal.App.3d 298 (*New Hampshire*); *Lainer*, *supra*, 170 Cal.App.3d 1.) The question here is whether the valve in the mill's backflow assembly that was substantially closed at the time of the fire was part of the water system used to furnish water to fight fires at the mill, such that the fire

---

[6] Section 815.4 similarly provides: "A public entity is liable for injury proximately caused by a tortious act or omission of an independent contractor of the public entity to the same extent that the public entity would be subject to such liability if it were a private person. Nothing in this section subjects a public entity to liability for the act or omission of an independent contractor if the public entity would not have been liable for the injury had the act or omission been that of an employee of the public entity."

damage "result[ed] from the condition of fire protection or firefighting equipment or facilities" as specified in section 850.4.[7]

In *Heieck*, the plaintiff filed a complaint against the City of Modesto for damages to his property caused by fire. (*Heieck, supra*, 64 Cal.2d at p. 230.) The complaint alleged in pertinent part that city fire personnel promptly responded with sufficient personnel, equipment, and facilities, "but because city employees had closed a valve in the water main there was no water in the fire hydrants and consequently the fire spread to plaintiff's premises." (*Id.* at pp. 230-231.) The valve had been closed to permit relocation of water mains, but it had not been reopened although the relocation had been completed at least a month before the date of the fire. (*Id.* at p. 231.) In upholding the sustaining of a demurrer without leave to amend, our Supreme Court held that "sections 850.2 and 850.4 of the Government Code expressly give immunity in this case. . . . The complaint in the present case alleges that city employees while acting in the scope of their employment closed a water valve and left it closed. Thus whether the alleged injury to plaintiff's premises be viewed as resulting from 'failure to provide or maintain sufficient . . . fire protection facilities' (§ 850.2), or from the closed 'condition' of the water valve (§ 850.4) the conclusion is inescapable that the Legislature intended to

---

[7]    The District also claimed that it is immune from tort liability under sections 850 and 850.2. Section 850 provides: "Neither a public entity nor a public employee is liable for failure to establish a fire department or otherwise to provide fire protection service." Section 850.2 provides: "Neither a public entity that has undertaken to provide fire protection service, nor an employee of such a public entity, is liable for any injury resulting from the failure to provide or maintain sufficient personnel, equipment or other fire protection facilities." The trial court ruled section 850 did not apply, but that the District was immune under sections 850.2 and 850.4. Because we conclude that the District is immune from tort liability under section 850.4, we need not consider whether it is also immune under section 850.2 or the common law as urged by the District on appeal.

11

establish immunity under the circumstances alleged by plaintiff." (*Id.* at p. 233, fn. omitted.)

In *New Hampshire,* the plaintiffs filed a complaint against the City and County of Madera for damages after the building they owned and leased burned to the ground. (*New Hampshire, supra*, 144 Cal.App.3d at pp. 301-302.) The complaint alleged in pertinent part that when the firefighters arrived on the scene, their fire suppression efforts were hampered because city employees negligently closed a water valve located several blocks away. (*Ibid.*) In upholding the sustaining of a demurrer without leave to amend, the Court of Appeal held that liability was precluded under sections 850.2 and 850.4. (*New Hampshire,* at pp. 302-304.) The court rejected the plaintiffs' assertion that the immunities contained in those statutes did not apply because the city's " 'water delivery system' and the closed valve . . . constituted a dangerous condition of property which was *not* fire department property or property under the control of City fire personnel." (*Id.* at p. 303.) Relying on *Heieck,* the court held that "a valve in a city water system used to furnish water to fight fires is part of the city fire protection 'facilities.' Thus, liability is precluded under both section 850.2 (failure to provide or maintain sufficient fire protection facilities) and section 850.4 (relating to the condition of the fire protection or firefighting equipment and facilities)." (*New Hampshire,* at pp. 304-305.) The court further determined that the plaintiffs' "assertion that the negligent acts of nonfirefighting City employees do not constitute firefighting activity is foreclosed since the water valve constituted part of the City fire protection facilities." (*Id.* at p. 305.)

In *Lainer*, the plaintiffs filed a complaint against the Department of Water and Power of the City of Los Angeles and the City of Los Angeles for tort and contract damages after the building they owned and rented burned down. (*Lainer, supra*, 170 Cal.App.3d at p. 4.) During the building's construction, the plaintiff owner requested, and the department installed, an eight-inch " 'fire service connection,' " the size required to service the 478 sprinkler heads in the building. (*Id.* at p. 5.) The fire service

connection was made by tapping the main water line in the street, and bringing a pipe to the property line, where it was connected with a " 'water gate valve' " and a meter which together controlled and measured the flow of water to the building's fire-sprinkler system. (*Ibid.*) The department was required by law to provide a fire service connection to anyone who applied for it. (*Ibid.*) The owner paid the department a $3,566 installation fee, and a flat monthly charge of $30 for the eight-inch fire service connection. (*Ibid.*) The plaintiffs' fire service connection was located in a vault to which the department maintained exclusive control. (*Ibid.*) While the vault was opened several times a year to read the meter, the gate valve was not tested following its installation. (*Ibid.*) Sometime thereafter, there was a fire at the building. (*Ibid.*) Although the sprinkler system was activated, an insufficient water supply to the system prevented the sprinklers from operating properly, and the building was engulfed in fire. (*Ibid.*) After the fire, it was determined that the gate valve of the fire service was open only one and one-half of a possible 26 turns, and for that reason, the fire sprinkler system had insufficient water pressure and was unable to extinguish the fire. (*Id.* at p. 6.) Relying on *Heieck* and *New Hampshire,* the Court of Appeal concluded that "the valve, although it was installed on private property, was nonetheless part of the 'city water system used to furnish water to fight fires [and as such] is part of the city fire protection "facilities." ' " (*Lainer,* at p. 8, quoting *New Hampshire*, *supra*, 144 Cal.App.3d at p. 304.) Accordingly, it concluded that sections 850.2 and 850.4 immunized the department from judgment against it based on tort theories of liability. (*Lainer,* at pp. 8-9.)

Plaintiffs attempt to distinguish *Heieck, New Hampshire,* and *Lainer* on the ground that each of those cases involved "publicly owned/operated firefighting equipment and/or facilities," and "[t]he water valve at issue in the present matter is not a part of [the District's] water system." (Boldface omitted.) As we shall explain, these are distinctions without a difference.

13

In interpreting section 850.4, we employ well-settled rules of statutory construction. "Our fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy. [Citations.]" (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.)

As mentioned, section 850.4 provides in pertinent part that "[n]either a public entity, nor a public employee acting in the scope of his employment, is liable for any injury resulting from *the condition of fire protection or firefighting equipment or facilities* . . . ." (Italics added.) The language of the statute does not limit its application to equipment or facilities that are publicly owned or operated. Had the Legislature intended to so limit section 850.4's application, one would have expected it to make this intent plain in the statutory language. Indeed, section 835, which plaintiffs cite in support of their position, contains such a limitation. It provides in pertinent part: "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of *its property* . . . ." (§ 835, italics added.)

The legislative history likewise is devoid of any indication that the Legislature sought to limit the application of section 850.4 as urged by plaintiffs. The Law Revision Commission comments to sections 850, 850.2, and 850.4 provide: "Sections 850, 850.2 and 850.4 provide for a broad immunity from liability for injuries resulting in connection with fire protection service. [¶] Sections 850 and 850.2 provide an absolute immunity from liability for injury resulting from failure to provide fire protection or from failure to

14

provide enough personnel, equipment or other fire protection facilities. Whether fire protection should be provided at all, and the extent to which fire protection should be provided, are political decisions which are committed to the policy-making officials of government. To permit review of these decisions by judges and juries would remove the ultimate decision-making authority from those politically responsible for making the decisions. [¶] Section 850.4 provides for absolute immunity from liability for injury caused in fighting fires (other than injuries resulting from operation of motor vehicles) or from failure to properly maintain fire protection equipment or facilities. There are adequate incentives to careful maintenance of fire equipment without imposing tort liability; and firemen should not be deterred from any action they may desire to take in combatting fires by a fear that liability might be imposed if a jury believes such action to be unreasonable." (Recommendation Relating to Sovereign Immunity, Number 1 – Tort Liability of Public Entities and Public Employees (Jan. 1963.) 4 Cal. Law Revision Com. Rep. (1963) pp. 861-862.)

In support of their position, plaintiffs cite Webster's Third New International Dictionary of the English Language (1993) at page 855, which defines "fire protection" as "measures and practices for preventing or reducing injury and loss of life or property by fire[;] . . . *activities relating to the extinguishment of fire*." (Italics added.) It is undisputed that the District supplies water to the mill for its fire suppression system, an activity that undeniably relates to the extinguishment of fire. Thus, under the definition urged by plaintiffs, the District's provision of water constitutes "fire protection," and by extension the valve constitutes fire protection equipment.

While the equipment at issue in *Heieck, New Hampshire,* and *Lainer* was publicly owned, there is no indication in those decisions that the courts relied on that fact in concluding that the public entities in those cases were immune from tort liability. Indeed, the court in *Lainer* rejected a similar argument. There, the plaintiffs asserted that section 850.4 was limited to fire protection equipment or facilities that are installed on public

15

property, and that *Heieck* and *New Hampshire* were inapplicable because unlike the valves at issue in those cases, the malfunctioning valve at issue in *Lainer* was installed on private property.  (*Lainer*, *supra*, 170 Cal.App.3d at p. 8.)  The court explained, "In the instant case, as in those cases, the valve, although it was installed on private property, was nonetheless part of the 'city water system used to furnish water to fight fires [and as such] is part of the city fire protection "facilities." ' " (*Ibid.*)[8]  The same is true here.

Water for the mill's fire suppression system, including its automatic sprinkler system and fire hoses, was required to pass through the mill's backflow assembly on its way from the city's fire service connection to the mill's fire suppression system. Consequently, the malfunctioning valve, although part of the mill's backflow assembly, was nonetheless part of the water system used to furnish water to fight fires and as such was part of the mill's fire protection facilities.  (*Lainer*, *supra*, 170 Cal.App.3d at p. 8; *New Hampshire, supra,* 144 Cal.App.3d at p. 304.)  That the valve was owned by the mill, as opposed to the District, is immaterial.

Even if the District is otherwise immune from tort liability under section 850.4, plaintiffs claim that the District abandoned or waived such immunity by adopting a policy "accepting liability for damage resulting directly from its negligence," and by "engaging in the commercial business of plumbing repair work for a fee."  We are not persuaded.  As we shall explain, the policy upon which plaintiffs rely does not apply to fire damages.

---

[8]   Plaintiffs assert that the *Lainer* court rejected the plaintiff's argument that sections 850.2 and 850.4 did not apply because the gate valve was installed on plaintiff's private property "because the valve in question was city owned and part of the city water supply used by the city in its fire protection activities."  The *Lainer* court said nothing of the sort.  As set forth above, it found, "In the instant case, as in those cases [*Heieck* and *New Hampshire*], the valve, although it was installed on private property, was nonetheless part of the 'city water system used to furnish water to fight fires [and as such] is part of the city's fire protection "facilities." ' " (*Lainer*, *supra*, 170 Cal.App.3d at p. 8.)

The policy is contained in the District's policy manual and states in pertinent part: "The District shall not be liable for damage of any kind whatsoever resulting from water or the use of water on the consumer's premises, unless such damage results directly from negligence on the part of the District." The District asserts that the language in question applies to "damage caused by water on the premises, not *fire* damage caused by the lack of water." We agree. Moreover, it is settled that a waiver of sovereign immunity " 'must be unequivocally expressed.' " (*United States v. Testan* (1976) 424 U.S. 392, 399, quoting *United States v. King* (1969) 395 U.S. 1, 4.) The policy language relied by plaintiffs does not amount to an unequivocal waiver of the immunity expressed in section 850.4.

Plaintiffs also assert that the District waived its sovereign immunity by "engaging in the commercial business of plumbing repair work for a fee." According to plaintiffs, "Where a government agency engages in a business enterprise, sovereign immunity does not apply." Assuming for argument's sake that this is an accurate statement of the law which would deprive a public entity of immunity under section 850.4, it is inapplicable here because the District was acting within the scope of its authority as a water supplier when it directed its contractor to test the mill's backflow assembly and facilitated its repair. As set forth above, the District was required to "assure that adequate maintenance and periodic testing [of backflow devices] are provided by the water user to ensure their proper operation." (Cal. Code Regs., tit. 17, § 7605, subd. (a).) Moreover, the District was required to assure that backflow devices are tested annually by "persons who have demonstrated their competency in testing of these devices to the water supplier," and "[w]hen devices are found to be defective, they shall be repaired or replaced . . . ." (*Id.* at subds. (b)-(c).) The District was seeking to fulfill its mandate when it directed its contractor Northwood to test the mill's backflow assembly and facilitated its repair, and thus, was engaged in governmental activity. The mill's claim that the District profited

17

from the repair is not supported in the record, which reflects that the District charged the mill the exact amount it was charged by its contractor Northwood.

Plaintiffs also claim that "[s]ection 850.4 does not apply if injury is caused from activity other than firefighting." They are mistaken. By its express terms, section 850.4 applies to "any injury resulting from the condition of fire protection or firefighting equipment or facilities, *or* . . . for any injury caused in fighting fires." (Italics & boldface added.) The Legislature's use of the term "or" indicates that the statute applies to injuries in either situation. Indeed, "with regard to the maintenance of fire protection equipment, courts have not limited section 850.4 immunity to activities *during* firefighting." (*Valley Title Co. v. San Jose Water Co.* (1997) 57 Cal.App.4th 1490, 1503-1504.)

Finally, plaintiffs contend the District is liable under section 815.6, which like section 815.2, provides a statutory exception to the general rule of public entity immunity: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." (§ 815.6) Section 815.6 "has three elements that must be satisfied to impose public entity liability: (1) a mandatory duty was imposed on the public entity by an enactment; (2) the enactment was designed to protect against the particular kind of injury allegedly suffered; and (3) the breach of the mandatory statutory duty proximately caused the injury." (*B.H. v. County of San Bernardino* (2015) 62 Cal.4th 168, 179.) The District contends plaintiffs cannot prevail under section 815.6 because the enactments upon which plaintiffs rely were not designed to protect against the particular kind of injury allegedly suffered. We agree.

One of the enactments upon which plaintiffs rely is section 7605 of title 17 of the California Code of Regulations, which imposes certain duties on water suppliers concerning the testing and maintenance of backflow preventers. It is designed to protect

18

the water system from contamination. (Cal. Code Regs., tit. 17, § 7604.) The other enactment relied on by plaintiffs is section 116555 of the Health and Safety Code, which is part of the California Safe Drinking Water Act and requires owners of public water systems to provide "a reliable and adequate supply of pure, wholesome, healthful, and potable water." (Health & Saf. Code, § 116555, subd. (a)(3).) It, too, is designed to protect the quality of the water. Because the injury at issue here has nothing to do with water quality, section 815.6 is of no assistance to plaintiffs.

For all the foregoing reasons, summary judgment was properly entered in the District's favor on the negligence causes of action.

## II
## Summary Judgment Was Properly Entered in the District's Favor as to the Breach of Contract Causes of Action

Plaintiffs contend the trial court erred in granting summary judgment in the District's favor as to the breach of contract causes of action because the District "was not acting as an ordinary water distributor when it contracted with [the mill] to repair the subject backflow device." We are not persuaded.

In *Lainer*, the court held that "[a]lthough the immunities of the Government Code do not apply to liability based on contract (Gov. Code, § 814), a water company cannot be held liable for failure, *from whatever cause*, to have a supply of water available on a consumer's premises for use in fire protection unless it '*expressly* assumes the liability.' " (*Lainer, supra,* 170 Cal.App.3d at p. 9, quoting *Niehaus Bros. Co. v. Contra Costa Water Co.* (1911) 159 Cal. 305, 322-325 (*Niehaus*).) "[A]n 'implied contract springing from the ordinary relation of a public water company and its consumers' " is insufficient. (*Lainer,* 170 Cal.App.3d at p. 10, quoting *Niehaus,* 159 Cal. at p. 316.) " '[L]iability for loss resulting from fire is not an incident of the *ordinary* relation of water distributor and consumer, but such liability on the part of a water company can only be created by an *express private contract whereby the water company agrees to furnish water as a*

19

*protection against fire.' "* (*Lainer, supra,* 170 Cal.App.3d at p. 10, quoting *San Leandro v. Railroad Com. of California* (1920) 183 Cal. 229, 233, fn. omitted.)

*Hunt Bros. Co. v. San Lorenzo Water Co.* (1906) 150 Cal. 51 (*Hunt*), involved such a contract. (*Lainer, supra,* 170 Cal.App.3d at pp. 11-12, citing *Niehaus, supra,* 159 Cal. at p. 313-314.) There, "the extent of the liability arising from the ordinary relationship of distributor and consumer was not involved." (*Lainer, supra,* 170 Cal.App.3d at p. 11, citing *Niehaus, supra,* 159 Cal. at p. 313.) Rather, " '[t]he contract between the parties in that case was an *express* one, whereby for a stipulated consideration the water company agreed to install a hydrant on the premises of the plaintiff, connect the same with its mains, and by means thereof supply the premises of the plaintiff with water for the express purpose of extinguishing any fire that might occur on the premises.' " (*Lainer, supra,* 170 Cal.App.3d at pp. 11-12, quoting *Niehaus, supra*, 159 Cal. at pp. 313-314.)

In *Lainer,* the court determined that "the only relationship between respondents and City was that of a water company engaged in distributing water for public use to consumers who availed themselves of their legal right to have the company connect its water system with their premises so that it could furnish them with water for their sprinkler system at ordinance rates. Under such relationship, no legal liability is implied for failure, from whatever cause, to have a supply of water available on the consumer's premises for use in fire protection; such liability can only be created by contract between the parties under which the water company *expressly* assumes the liability." (*Lainer*, *supra*, 170 Cal.App.3d at p. 14.)

Here, it is undisputed that there was no express contract for fire protection. Even assuming that the relationship between the mill and the District extended beyond the "ordinary" relationship of distributor and consumer by virtue of the agreement to repair the backflow assembly, to recover on its breach of contract cause of action plaintiffs still must establish an express contract between the mill and the District for fire protection.

20

(*Lainer, supra,* 170 Cal.App.3d at pp. 11-15.)  In *Hunt,* "the extent of the liability arising from the ordinary relationship of distributor and consumer was not involved."  (*Lainer,* at p. 11.)  Nevertheless, the plaintiff was required to establish an express contract in order to recover on its breach of contract cause of action.  (*Id.* at p. 11-12.)  As was the case in *Lainer*, here, "[i]t is obvious that no liability of an unknown amount for failure to furnish fire protection could have been contemplated by the water company from merely [repairing a backflow assembly] on a consumer's property at its request, . . . [and] charging . . . [\$427] . . . to cover the cost of the [repair] . . . ."  (*Id.* at pp. 13-14.)

Plaintiffs seek to distinguish *Lainer* on the ground that it "involved a fire loss claim against a City which operated a fire department.  There was no 'water company' involved in the case."  Not so.  *Lainer* involved a fire loss claim against the City of Los Angeles *and* the Department of Water and Power of the City of Los Angeles, and the court's ruling that "sections 850.2 and 850.4 immunize City from a judgment against it based on tort theories of liability" applied to both the City of Los Angeles and its Department of Water and Power.  (*Lainer*, *supra*, 170 Cal.App.3d at pp. 8-9; *id.* at p. 4.)  Indeed, *Lainer* held that "a water company cannot be held liable for *failure, from whatever cause, to have a supply of water available on a consumer's premises for use in fire protection* unless it '*expressly* assumes the liability.'  [Citation.]"  (*Id.* at p. 9, italics added.)  Contrary to plaintiffs' assertion, this case *is* about the failure to have a supply of water available to fight a fire.  That the failure was caused by the negligent failure to fully re-open a valve in the mill's backflow assembly is of no consequence.  (*Ibid.*)

To the extent plaintiffs claim that the District was not acting as a water supplier when it directed Northwood to test the mill's backflow assembly and facilitated its repair, we disagree.  As set forth above, as a water supplier, the District was required to "assure that adequate maintenance and periodic testing [of backflow devices] are provided by the water user to ensure their proper operation."  (Cal. Code Regs., tit. 17, § 7605, subd. (a).)  Moreover, backflow devices must be tested annually by "persons who have demonstrated

21

their competency in testing of these devices to the water supplier," and when a device is found to be defective, it must be repaired or replaced and tested immediately thereafter. (*Id.* at subds. (b)-(d).) Thus, the District was acting within its role as a water supplier when it directed its contractor Northwood to test the mill's backflow assembly and facilitated its repair.

Finally, plaintiffs' reliance on the unremarkable principle that " 'accompanying every contract is a common-law duty to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done' " (*Roscoe Moss Co. v. Jenkins* (1942) 55 Cal.App.2d 369, 376, quoting 38 Am.Jur. (1941) Negligence, § 20, p. 662) is unavailing. Even assuming for argument's sake that the District breached the contract to repair the backflow assembly by failing to perform the repair with the requisite " 'care, skill, reasonable expedience, and faithfulness,' " under *Lainer* and the cases cited therein, plaintiffs still are required to establish the existence of an express agreement between the mill and the District for fire protection to prevail on their breach of contract causes of action. As detailed above, it is undisputed that no such contract exists. Accordingly, summary judgment was properly entered as to the breach of contract causes of action.

III
Summary Judgment Was Properly Entered in the District's Favor as to the
Breach of Warranty Causes of Action

Plaintiffs next contend that the trial court erred in concluding that the present action did not involve the sale of goods, and in entering summary judgment as to the implied warranty of merchantability and fitness causes of action on that basis. We disagree.

Under the California Uniform Commercial Code, every contract for the sale of goods contains a warranty, implied by law, that the goods are of merchantable quality. (Cal. U. Com. Code, § 2314, subd. (1).) The California Uniform Commercial Code also implies a warranty of fitness for a particular purpose. (Cal. U. Com. Code, § 2315.)

Where the primary objective of a transaction is to obtain services, the doctrine of implied warranty does not apply.  (*Stuart v. Crestview Mut. Water Co.* (1973) 34 Cal.App.3d 802, 811; see also *Allied Properties v. John A. Blume & Associates* (1972) 25 Cal.App.3d 848, 855-856.)  "A contract for the furnishing of labor and materials is not a contract for the sale of goods."  (*Filmservice Laboratories, Inc. v. Harvey Bernhard Enterprises, Inc.* (1989) 208 Cal.App.3d 1297, 1305 (*Filmservice*).)

The operative third amended complaints alleged that the District breached the implied warranties of merchantability and fitness in that the backflow valve system the mill purchased from the District was not fit for the ordinary purpose for which such a good is used, or the "particular purpose of permitting and controlling adequate water volume and pressure" in the mill.

It is undisputed that the mill did not purchase a backflow valve system from the District, but rather the mill's backflow assembly was repaired by the District's contractor. More specifically, upon being advised by its contractor that both check valves in the mill's backflow assembly leaked, the District advised the mill of the issue and gave the mill the option of allowing the District's contractor to make the repair or hiring its own contractor to make the repair.  The mill chose to have the District's contractor make the repair.  The District's contractor performed such repair by cleaning the valves and "replacing discs."  Thereafter, the contractor tested the backflow assembly by substantially closing one of the two valves in the backflow assembly, and negligently failed to fully re-open it upon completing the test.

As set forth above, " '[w]here the primary objective of a transaction is to obtain services, the doctrine[] of implied warranty . . . [does] not apply [citation]."  (*Stuart v. Crestview Mut. Water Co., supra,* 34 Cal.App.3d at p. 811.)  This is such a case.  The "essence" of the repair agreement was to obtain a service, namely to repair the check valves in the mill's backflow assembly.  While that agreement "resulted, incidentally, in the transfer of some tangible personal property; it was not for the sale of the goods."

(*Filmservice, supra,* 208 Cal.App.3d at p. 1306.)  In other words, the provision of the parts necessary to do the repair was purely incidental to the contract; the repair of the valves was at the heart of the matter.  (See, e.g., *Murphy v. E.R. Squibb & Sons, Inc.* (1985) 40 Cal.3d 672, 677, 679.)

While not pleaded in the operative third amended complaints, plaintiffs claimed below and on appeal that the District breached the implied warranties by failing to provide an adequate supply of water.  The complaint serves to delimit the scope of the issues before the court on a motion for summary judgment (*FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 381 (*FPI*)), and a party cannot successfully resist summary judgment on a theory not pleaded (*Roth v. Rhodes* (1994) 25 Cal.App.4th 530, 541 (*Roth*); see also *Granadino v. Wells Fargo Bank, N.A.* (2015) 236 Cal.App.4th 411, 419).  Therefore, plaintiffs cannot avoid summary judgment by claiming that the District breached the implied warranties of merchantability and fitness by failing to provide an adequate supply of water.  In any event, the claim lacks merit because, as previously discussed, the absence of an express agreement for fire protection, a water supplier, such as the District, cannot be held liable in contract for the failure to supply adequate water to suppress a fire.  (*Lainer, supra,* 170 Cal.App.3d at p. 9.)

The trial court properly granted summary judgment as to the implied warranty causes of action.

IV
The Trial Court Properly Ruled That Plaintiffs Cannot Defeat Summary Judgment by Claiming That the District's Actions Resulted in an Inverse Condemnation

Finally, plaintiffs contend that the trial court erred in entering summary judgment in the District's favor because the District's "failure to implement a dedicated fire suppression line at the mill constitutes an inverse condemnation action."  First, as the District points out, plaintiffs did not plead inverse condemnation in their operative third amended complaints, and the trial court refused to consider the merits of such a claim on that basis.  As previously discussed, the complaint serves to delimit the scope of the

issues before the court on a motion for summary judgment (*FPI, supra,* 231 Cal.App.3d at p. 381), and a party cannot successfully resist summary judgment on a theory not pleaded (*Roth, supra,* 25 Cal.App.4th at p. 541). Therefore, plaintiffs cannot avoid summary judgment by claiming that the District's "failure to implement a dedicated fire suppression line at the mill constitute[d] an inverse condemnation action." Second, as we shall explain, such a claim lacks merit.

"An inverse condemnation action . . . is an eminent domain action initiated by one whose property was taken or damaged for a public use." (*Pacific Bell v. City of San Diego* (2000) 81 Cal.App.4th 596, 601 (*Pacific Bell*).) "The fundamental policy underlying the concept of inverse condemnation is that the costs of a public improvement benefiting the community should be spread among those benefited rather than allocated to a single member of the community. [Citation.] [¶] A successful inverse condemnation claimant must prove that a public entity has taken or damaged its property for public use." (*Id.* at p. 602.) In order to prevail on an inverse condemnation cause of action, a plaintiff must establish that the damage to his private property was caused by a "public improvement as deliberately conceived, altered or maintained." (*Ibid*.) "A party who does nothing more than establish property damage as the result of negligent conduct of public employees or a public entity has not established a right to recover under a claim of inverse condemnation." (*City of Los Angeles v. Superior Court* (2011) 194 Cal.App.4th 210, 221.)

In *Pacific Bell,* the city knew that the cast-iron pipes in its water delivery system needed to be replaced due to the high number of corrosion-related breaks. (*Pacific Bell, supra,* 81 Cal.App.4th at p. 600.) The city, however, had no program or method for testing or inspecting the pipes to identify those that needed to be replaced. (*Ibid.*) Rather, it learned that a cast-iron pipe needed replacement only when it broke. (*Ibid.*) Over the years, the city denied numerous requests for a water rate increase to fund its water pipe repair and rehabilitation efforts. (*Ibid*.) In 1997, Pacific Bell's facility

25

suffered substantial damage when a corroded cast-iron water pipe servicing a fire hydrant burst and water flooded the facility. (*Ibid.*) In reversing a judgment entered in the city's favor, the Court of Appeal held that the evidence showed that the city's "water delivery system was deliberately designed, constructed and maintained without any method or program for monitoring the inevitable deterioration of cast-iron pipes other than waiting for a pipe to break," and that the city "received the cost savings from its 'replace it when it breaks' method of maintenance, turning down numerous rate increases necessary to fund a different, more proactive approach to replacing these deteriorating pipes." (*Id.* at p. 607.) The court further determined that although the city's "replace it when it breaks" method of maintenance "may well have been reasonable because the costs of a prophylactic approach may have outweighed its benefits," " 'since the undertaking of the [project] at this lower cost created some risk, however slight, of damage to plaintiffs' property, it is proper to require the public entity to bear the loss when damage does occur.' [Citation.]" (*Id.* at p. 608.)

Unlike *Pacific Bell*, here, there is no evidence that the damage to the mill was caused by a public improvement operating as deliberately planned and constructed. It is undisputed for purposes of the underlying motion that the fire damage at issue here was caused by the negligence of the District's contractor in failing to fully re-open one of the check valves in the mill's backflow assembly. Plaintiffs assert that the District's failure to require the mill to install a dedicated fire line constitutes an inverse condemnation because the decision was made to avoid putting people out of work. According to plaintiffs, the District did not require the mill to install a dedicated fire line because doing so would have required the mill, the county's largest employer, to shut down for a period of time, negatively impacting the community by temporarily putting many of its residents out of work. There is no evidence in the record, however, that would support such a finding. To the contrary, the only evidence is that the District was concerned about the lack of a dedicated fire line because the mill was obtaining water for purposes other than

26

fire suppression without paying for it as the line was not metered. Indeed, the District wrote to the mill, advising: "While performing the annual backflow device testing, . . . our contractor . . . shut off the [mill's] fire suppression system to test the eight-inch backflow device. When the device was shut off, water used for lubrication of the saws was also shut off. This was caused by a cross-connection with the sawmill's domestic lines. It is not known when this connection was made, but it appears that it has been for a number of years. Regardless, this cross-connection needs to be corrected immediately." The District directed the mill "to remove the cross-connection and connect the saw lubrication water to the existing domestic water service or install a three-inch compound water meter on the three-inch fire line as shown on the attached sketch." In sum, the evidence before us does nothing more than establish the fire damage was the result of negligent conduct of public employees or a public entity, and thus, fails to establish a right to recover under a claim of inverse condemnation. (See *City of Los Angeles v. Superior Court*, *supra*, 194 Cal.App.4th at p. 221.)

## DISPOSITION

The judgment is affirmed. The District shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)


/s/
Blease, Acting P. J.

We concur:


/s/
Hull, J.


/s/
Butz, J.

27